VISTEIN et al., Appellants,

v.

KEENEY, d.b.a. Keeney Excavating, et al., Appellees.

[Cite as *Vistein v. Keeney* (1990), 71 Ohio App.3d 92.]

Court of Appeals of Ohio,
Lake County.

No. 88–L–13–228.

Decided Dec. 31, 1990.

*Huffman, Thomas & Massetti* and *Michael A. Thomas,* for appellants.
*Lyons, Gurley & Hanahan* and *James M. Lyons,* for appellees.

CHRISTLEY, Presiding Judge.

In the spring of 1981, appellee, Dale Evans, purchased a parcel of land located on Christian Avenue in Concord Township, Lake County, Ohio. The

land in question was heavily wooded and also had a small creek running through it. This creek was approximately six to eight feet wide and anywhere from three inches to one foot deep, depending on the time of year and the weather.

At approximately the same time he made this purchase, Evans decided to build a home on the property. Under the plans which Evans formulated, the house was to be set back in the woods, with the creek running between the house and the road. As a result, Evans also decided to build a small bridge over the creek. Not only was the bridge needed to get heavy equipment back to the construction site, but Evans felt that it would add to the aesthetic value of the property.

After some preliminary consultation with a county engineer, Evans contacted the Keeney Excavating Company, which is a sole proprietorship owned by appellee D.R. Keeney. Upon further discussion, it was decided that the opening of the bridge, through which the water would flow, would be rectangular in shape. Appellees also determined that the opening should be of sufficient size to accommodate water flow equivalent to that which would go through a pipe six feet in diameter.

Keeney constructed the bridge in accordance with the specifications to which he and Evans had agreed. However, before he could move into the house, Evans was told that part of the bridge wall had be extended. Evans constructed this addition himself, using concrete which was left over from the garage.

In June 1984, approximately three years after the original construction, part of the bridge collapsed. Inspection of the bridge showed that erosion had occurred around the footing of the head wall closest to the house. That portion of the bridge had also sunk twelve inches. In addition, that particular head wall had become detached from the bank.

Keeney was called in to make the needed repairs. After removing the decks from the top of the bridge, Keeney and his son poured additional concrete around the head wall, filling up the void which had been created. In order to make the bridge level again, Keeney placed concrete blocks on the concrete before replacing the decks. In making these repairs, Keeney did not alter the original design of the bridge.

During the three-year period after he had built the house, Evans had been sporadically attempting to sell the property. In November 1984, a realtor showed the house to appellants, Diana and Paul Vistein. Near the conclusion of this visit, the realtor asked Evans, in the presence of appellants, about the bridge. Evans responded that the bridge had supported a heavy truck. Appellants subsequently purchased the Evans home in January 1985.

For approximately eighteen months, appellants did not experience any problems with the bridge. Then, in June 1986, the bridge partially collapsed during a heavy rainstorm. Again, the concrete head wall closest to the house fell apart. In turn, this caused the wall on the street side of the bridge to become detached from the embankment.

Appellants did not attempt to repair the old bridge. Instead, appellants installed a new bridge, which had a completely different design than the original one. Only one part of the old bridge was used in the construction of the new one. During the period in which the construction occurred, appellants were forced to leave their vehicles by the street and walk across the creek on railroad ties.

In May 1987, appellants initiated an action in the Lake County Court of Common Pleas against appellees. Their complaint contained two counts. In the first, appellants alleged that both appellees had been negligent in the design and construction of the original bridge. In the second, appellants asserted that Evans had fraudulently misrepresented the condition of the bridge at the time of the sale. Appellants sought $150,000 in compensatory and punitive damages.

After appellees had filed separate answers, the matter proceeded to trial. At the close of the parties' opening statements, counsel for appellees moved for a directed verdict as to Keeney. This motion was based on the ground that there was no privity of contract between Keeney and appellants. The trial court granted the motion.

At the close of appellants' case, counsel for appellees moved for a second directed verdict, this time as to Evans. This motion was based on two grounds: (1) that appellants had failed to present any evidence showing that the original bridge had been defective; and (2) that the evidence appellants had presented was insufficient to sustain a claim of fraud. The trial court also granted this motion and dismissed appellants' complaint.

On appeal to this court, appellants have assigned the following as error:

"1. The trial court committed prejudicial error and abused its sound discretion in excluding the expert testimony of Richard D. McKeon, P.E.

"2. The trial court committed prejudicial error and abused its sound discretion in failing to grant a reasonable continuance based upon the unavailability of Appellants' alternate expert witness, Mr. Charles Soetera.

"3. The trial court committed prejudicial error and abused its sound discretion in failing to permit a jury view of the premises upon a timely request by plaintiffs.

"4. The trial court committed prejudicial error and abused its sound discretion in directing a verdict in favor of defendant Keeney upon opening statement.

"5. The trial court committed prejudicial error in directing a verdict for defendant Evans upon the close of plaintiffs' case in chief as to all causes of action.

"6. The trial court committed prejudicial error and abused its sound discretion in excluding pertinent portions of the testimony of Albert E. Saari, P.E."

As part of their case at trial, appellants attempted to present the testimony of Richard McKeon, a licensed engineer in the state of Ohio. After McKeon's educational background and prior experience had been established, the trial court granted the motion of appellee Evans for a *voir-dire* examination of the witness. Upon the conclusion of this examination, the court held that McKeon was not qualified to testify as an expert witness because his experience in the construction of bridges was extremely limited. In their first assignment of error, appellants maintain that the trial court erred in making this determination.

Evid.R. 104(A) provides that preliminary questions concerning the competency of evidence, including the qualification of a person to be a witness, must be determined by the trial court before the evidence is presented. In relation to expert testimony, the basic standard which the court must apply is stated in Evid.R. 702:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

█ This standard is identical to the one which the courts of this state followed prior to the adoption of the Rules of Evidence in 1980. See *Alexander v. Mt. Carmel Medical Ctr.* (1978), 56 Ohio St.2d 155, 10 O.O.3d 332, 383 N.E.2d 564; *State Auto Mut. Ins. Co. v. Chrysler Corp.* (1973), 36 Ohio St.2d 151, 65 O.O.2d 374, 304 N.E.2d 891. As the language of the rule implies, the standard does not require that the proposed expert be the best witness on a given topic; instead, the critical question is whether the witness possesses knowledge which an ordinary individual would not have.

█ A review of McKeon's testimony prior to the *voir-dire* examination shows not only that was he qualified as a registered professional engineer in two states, but that he had worked in the construction business since 1954. In addition, McKeon also testified that for the last five years of his career, he

had specialized in determining the cause of defects in buildings and other structures. Taken as a whole, this testimony was sufficient to qualify McKeon as an expert on general engineering principles.

■ As was noted earlier, the trial court's ruling on this issue was predicated upon the finding that McKeon had limited experience in the construction of bridges. As a general rule, a witness can still qualify as an expert, even though he is not a specialist in a particular area of a field of expertise. *Village Station Assoc. v. Spancrete Northeast, Inc.* (Mar. 8, 1985), Geauga App. No. 1125, unreported, 1985 WL 7824. In relation to medical expert testimony, the Supreme Court has held that if " * * * the fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant." *Alexander, supra,* 56 Ohio St.2d at 158, 10 O.O.3d at 334, 383 N.E.2d at 566.

■ As to this particular point, appellants argue that McKeon's qualifications to testify about bridges were similar to those of the nonspecialist in the medical expert situation. However, a review of the medical cases shows that the nonspecialist is only qualified to testify as an expert when he is familiar with the treatment used by the specialist. For example, in *King v. LaKamp* (1988), 50 Ohio App.3d 84, 553 N.E.2d 701, a physician specializing in orthopedic surgery, including foot surgery, was deemed qualified to comment on the treatment followed by the defendant podiatrist because he was familiar with the particular procedures employed in that case.

In the instant case, McKeon's own testimony shows that he was not familiar with the procedure for designing bridges. During the *voir-dire* examination, McKeon stated that he had worked only on one project involving a bridge and that he was not particularly familiar with that aspect of civil engineering. In addition, he specifically stated that he did not consider himself an expert on bridges.

In *Village Station, supra,* this court also held that the admission of a nonspecialist's testimony is a matter within the sound discretion of the trial court. See *Yoder v. Bernier* (1976), 49 Ohio App.2d 369, 3 O.O.3d 432, 361 N.E.2d 490, syllabus. Given McKeon's own testimony, the trial court did not abuse its discretion in excluding those aspects of McKeon's testimony which concerned the design and the construction of the bridge in question.

■ As a result of its ruling at the end of the *voir-dire* examination, the trial court did not allow McKeon to testify as an expert. Based upon our previous discussion under this assignment, this court concludes that McKeon should have been permitted to testify concerning general engineering princi-

ples, if such testimony would have been relevant. During the oral argument following the examination, appellants' counsel specifically raised this particular point, but the trial court did not alter its ruling on the issue.

However, in a proffer which was read into the record at the conclusion of appellants' case, their counsel stated that if McKeon's testimony had been admitted, he would have testified that the collapse of the bridge was caused by an improper design. Counsel did not indicate in the proffer what testimony McKeon would have given concerning general engineering principles and how it was relevant to the issues of the case. Thus, since this court agrees that McKeon was not qualified to testify as to the design and construction of the bridge, appellants' proffer does not demonstrate that they were prejudiced by the trial court's decision to exclude all of McKeon's proposed testimony. Appellants' first assignment of error is accordingly without merit.

McKeon was prepared to testify on Thursday, November 17, 1988. As a result of the trial court's ruling, appellants did not present any expert testimony concerning the quality of the original bridge. Upon presenting its final witness on Monday, November 21, appellants moved the court for a continuance, contending that they were in the process of locating another expert witness. The trial court initially gave appellants forty-five minutes in which to produce this witness. When appellants could not do so, the court denied their motion to continue the case until the following day.

In their second assignment of error, appellants assert that the trial court erred in denying their request for a continuance. In support, appellants argue that since the court knew that they would not be able to avoid a directed verdict as to Evans without the new witness, it should have given them another opportunity to present the expert testimony.

As was the case with the determination of whether a witness qualifies as an expert, the decision to grant or deny a motion for a continuance is also within the sound discretion of the trial court. *Coats v. Limbach* (1989), 47 Ohio St.3d 114, 548 N.E.2d 917; *Garrett v. Garrett* (1977), 54 Ohio App.2d 25, 8 O.O.3d 41, 374 N.E.2d 654. As has been noted on innumerable occasions, an abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

In this case, the record shows that appellants had at least two days in which to locate the new expert and bring him forward. As appellees note, the record also indicates that appellants had contacted the new expert before trial, but had simply decided not to call him because his testimony would have supposedly been redundant.

In light of these circumstances, it is evident that appellants' predicament was caused by a tactical decision of their counsel. In this regard, this court would also note that there is no indication in the record that appellants' counsel was not fully aware of McKeon's limited qualifications before calling him as a witness; thus, appellants cannot maintain that they were surprised by the exclusion of McKeon's testimony. Accordingly, the facts of this case do not support the conclusion that the trial court abused its discretion in denying appellants' request for a continuance.

█ In their next assignment of error, appellants submit that the trial court erred in not permitting the jury to view their property and the bridge in question. Appellants made this particular motion on the morning of the first day of the trial. Upon hearing arguments from both sides, the court overruled the motion, emphasizing both the timing of the motion and the fact the parties were prepared to proceed. The court also noted that the original bridge was no longer standing.

R.C. 2315.02 governs the view of property by a jury. Under this statute, the trial court may order a visit to the subject property if it is deemed "proper." As this language implies, a view of property is not mandatory in every case, even upon request. *Schwartz v. Wells* (1982), 5 Ohio App.3d 1, 5 OBR 1, 449 N.E.2d 9. As a result, the granting of such a motion is again a matter within the trial court's discretion. *Id.; Schmelzer v. Farrar* (1974), 40 Ohio App.2d 440, 69 O.O.2d 384, 320 N.E.2d 707.

█ Based upon the colloquy between the court and counsel for the parties, it is evident that the denial of the motion was based upon a concern for time. The court stated that it was not prepared and did not presently have the facilities to take the jury to appellants' property. While the conservation of judicial resources is a factor to be considered in this situation, the critical question is whether the jury would benefit from a view of the property. As this court noted in *Dorsey v. Ohio Edison* (Mar. 17, 1989), Trumbull App. No. 4009, unreported, the purpose for visiting the subject property is to aid the jury in understanding and applying the evidence which will be presented at trial.

█ In support of their motion, appellants argued at trial that the jury would benefit from seeing "the lay of the land" in the area of the bridge. Counsel for appellants also emphasized that although the old bridge was no longer standing, parts of its foundation was still in place. While the merits of their position cannot be questioned, appellants have failed to demonstrate that the jury could not have derived the same understanding from the various evidence presented at trial, including the photographs of the bridge. Thus,

appellants' third assignment of error is also without merit, since the record does not support the conclusion that the trial court abused its discretion in denying their motion.

The next two assignments of error in this appeal address the merits of the trial court's decisions on appellees' two motions for a directed verdict. In relation to Keeney, appellants assert under their fourth assignment of error that the statements of their counsel during opening statement were sufficient to state a viable cause of action. Specifically, appellants argue that the trial court erred in holding that privity of contract between themselves and Keeney was a necessary element of any claim for damages incurred in repairing the bridge.

In presenting the foregoing argument, appellants have also raised two preliminary issues to be considered under this assignment of error. The first issue concerns the timeliness of Keeney's motion for a directed verdict. As was noted earlier, Keeney's motion was made after the parties had presented their opening statements. Appellants now contend that Keeney was required under Civ.R. 50(A) to move for a directed verdict before presenting his own opening statement.

Without addressing the merits of this particular argument, this court would note that appellants never objected to the timeliness of Keeney's motion. As a general rule, the failure to object at the trial level constitutes a waiver of any claimed error; as a result, that error cannot be raised for the first time on appeal. *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629. Moreover, even if Keeney's motion was technically not timely under the rule, the record shows that appellants were not prejudiced by this procedure. The trial court gave appellants every opportunity to respond to the motion before rendering its judgment.

The second preliminary issue concerns the scope of the claim which appellants asserted against Keeney. In their appellate brief, appellants maintain that their claim was based upon two theories of recovery: negligence and a breach of an implied warranty of fitness and workmanship.

A review of the entire record in this case demonstrates that appellants' complaint did not contain any allegations as to the latter theory. Under their first cause of action, which applied to both appellees, appellants alleged that "culvert structure" had been negligently designed and constructed. They further alleged that as a result of the failure of the structure, they had suffered both economic loss and " * * * disruption of Plaintiff's anticipated and implied warranty of continued use and enjoyment of same." The complaint does not refer to a contract between Keeney and Evans, nor does it refer to a breach of an implied warranty of fitness and workmanship.

In addition, a review of the trial transcript shows that appellants' opening statement suffers from the same deficiency. Again, appellants' counsel simply asserted that appellees had acted negligently in constructing and repairing the bridge.

When a motion for a directed verdict is made following the plaintiff's opening statement, the trial court is required to consider the pleadings and the statement in rendering its decision. *Archer v. Port Clinton* (1966), 6 Ohio St.2d 74, 35 O.O.2d 88, 215 N.E.2d 707. In the instant case, neither appellants' complaint nor their opening statement contained any reference to an implied warranty of fitness and workmanship, its origin, or its alleged breach. While the same conduct can constitute both negligent behavior and a breach of such a warranty, negligence and breach of an implied warranty are distinct causes of action. Accordingly, in determining whether the trial court erred in granting a directed verdict in favor of Keeney, this court will consider only appellants' contention that their opening statement was sufficient to state an action in negligence. Appellants simply did not raise a claim based upon an alleged breach of an implied warranty.

In arguing that they can maintain an action in negligence without having been a party to the agreement between Evans and Keeney, appellants rely primarily upon the holding of the Supreme Court in *McMillan v. Brune–Harpenau–Torbeck Builders, Inc.* (1983), 8 Ohio St.3d 3, 8 OBR 73, 455 N.E.2d 1276. In that case, subsequent purchasers of real property sued the original builder-vendor for damages incurred as a result of landslide problems. Overruling its previous decision in *Insurance Co. of N. Am. v. Bonnie Built Homes* (1980), 64 Ohio St.2d 269, 18 O.O.3d 458, 416 N.E.2d 623, the court held that the subsequent purchasers were not required to establish privity of contract in order to state a viable claim.

While acknowledging that Keeney is not a builder-vendor, appellants submit that the same policy considerations cited in *McMillan* support the conclusion that privity of contract is not a necessary element of the claim they sought to assert against Keeney. For the reasons which follow, this court finds this argument to be without merit and concludes that the trial court did not err in granting a directed verdict in favor of Keeney.

The *McMillan* decision extended the scope of a tort duty which the Supreme Court had originally recognized in *Mitchem v. Johnson* (1966), 7 Ohio St.2d 66, 36 O.O.2d 52, 218 N.E.2d 594. In this earlier case, the plaintiffs had entered into an agreement to purchase a partially completed residence from the defendant, a builder-vendor. As part of the transaction, the defendant agreed to finish the house. Upon taking possession of the completed structure, the

plaintiffs began to experience various difficulties which were allegedly due to poor workmanship on the part of the defendant.

Prior to *Mitchem*, the Eighth Appellate District had held that when the purchase agreement is signed before the work is completed, a warranty that the structure will be reasonably fit for occupancy would be implied as part of the bargain. See *Vanderschrier v. Aaron* (1957), 103 Ohio App. 340, 3 O.O.2d 367, 140 N.E.2d 819. Rejecting *that* particular aspect of *Vanderschrier*, the *Mitchem* court held that instead, the builder-vendor had a duty under the law to build the structure in a workmanlike manner. The basis for this holding was the proposition that while the builder-vendor should not be held strictly liable for all defects which might develop in a house, he should be held accountable for those which were caused by his negligence. See, also, *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 23 O.O.3d 346, 433 N.E.2d 147.

At the conclusion of its opinion, the *Mitchem* court summarized its decision in the following manner:

"Thus, it is not the law that a vendor-builder 'does not generally, in the absence of some express bargain or warranty, undertake *any* obligation with regard to the condition of the house.' (Emphasis supplied.) *Vanderschrier v. Aaron*, 103 Ohio App., at page 341 [3 O.O.2d at page 368, 140 N.E.2d at page 821]. Nor can we agree with the trial court's instruction in this case that it was 'an implied term of the sale that the builder will complete the house in such a way that it will be reasonably fit for its intended use * * *.' On the other hand, we do concur in the statement that 'it is an implied term of the sale that the builder will complete the house in such a way that * * * the work (both before and after the sale) would be done in a * * * workmanlike manner.'" *Mitchem, supra,* 7 Ohio St.2d at 73, 36 O.O.2d at 56, 218 N.E.2d at 599.

Subsequent appellate decisions have held that this common-law duty to perform in a workmanlike manner is also applicable to an independent contractor. See, *e.g., Warren v. Springfield United Roofing Corp.* (June 23, 1989), Greene App. No. 88 CA 77, unreported, 1989 WL 68286. However, although the action to enforce this duty appears to sound in tort, at least one appellate court has held that the resulting action is one in contract. *Lloyd v. William Fannin Builders* (1973), 40 Ohio App.2d 507, 69 O.O.2d 444, 320 N.E.2d 738.

Recently, the Tenth Appellate District has had the opportunity to fully explain the basis of the *Lloyd* holding. In *Barton v. Ellis* (1986), 34 Ohio App.3d 251, 518 N.E.2d 18, after stating the duty created in *Mitchem*, the court noted, at 253, 518 N.E.2d at 20:

"Application of this standard has resulted in a distinction between the sale of a completed residence on the one hand, and the contracting for future construction services on the other (*e.g.*, the sale of partially completed residences with some work to be completed, remodeling, or modification of existing structures). Absent express or implied warranties as to the quality or fitness of work performed, the liability of a builder-vendor of a *completed* structure for failure to exercise reasonable care to perform in a workmanlike manner sounds in tort, and arises *ex delicto*. The essential allegation is that the builder-vendor's negligence proximately causes the vendee's damages. *Velotta, supra, Mitchem, supra.* By contrast, in the provision of future services, liability arises *ex contractu* as an implied bargain, *Vanderschrier, supra*, provision, condition, or term of sale, *Mitchem, supra* [7 Ohio St.2d] at 73 [36 O.O.2d at 56, 218 N.E.2d at 599]. * * * "

As the *Barton* court indicates in the first sentence of the quotation, the foregoing distinction is based upon the nature of the consideration which is given in return for the purchase price. If the work has been completed before the deal is made, then the consideration is the structure itself. Under this scenario, the structure is similar to any product which is made by a manufacturer and then distributed to the public. In *McMillan, supra,* the court relied in part on the products-liability analogy in deciding that privity of contract was not necessary when the contractor is a builder-vendor.

When the work is to be done in the future, though, the consideration is the services which will be performed by the contractor. Due to the nature of the contract, the characteristics of the product will not be governed by the manufacturer's specifications, but the requirements or desires of the purchaser. While the contractor is still required to perform the services in a workmanlike manner, the quality of the product will be governed by the language of the contract itself. Any determination of whether the services were performed in a workmanlike manner must be made in reference to the actual bargain of the parties.

The importance of the foregoing distinction can be seen from the facts in this case. Based upon the testimony presented in appellants' case, the bridge was built according to specifications to which both Evans and Keeney agreed. Hypothetically, if the design of the bridge had been dictated by Evans and the subsequent failure was due solely to the design, then Keeney would not be liable under the workmanlike standard.

Thus, when the contract is for services, the defect could just as easily be due to the requirements of the purchaser as the workmanship of the contractor. This fact distinguishes the independent contractor situation from that of the builder-vendor. As to the latter, no defect can be attributed to the

original purchaser. Thus, when the contract is for services, we believe that the subsequent purchaser's remedy is against the individual from whom he purchased the property, not the contractor.

The independent contractor situation can be distinguished from that of the builder-vendor for one other reason. In *McMillan, supra,* the court emphasized that if privity of contract was an element of the claim, then the vendor could utilize "strawman" vendees to escape potential liability. In our case, though, there could be no such thing as a "strawman," since the contractor is performing specific services for an individual.

As a general rule, if a plaintiff brings an action sounding in tort and bases his claim upon a theory of duty owed by a defendant as a result of contractual relations, he must be a party or privy to the contract in order to prevail. See *Poteet v. Rudy* (July 14, 1980), Montgomery App. No. 6681, unreported; 70 Ohio Jurisprudence 3d (1986) 60, Negligence, Section 18. This is based upon the fact that the plaintiff has failed to establish a duty owed to him. Based upon the policy considerations cited above, this court concludes that the situation in this case, unlike the one in the builder-vendor scenario, does not warrant the elimination of the privity requirement.

In support of their position as to the claim against Keeney, appellants have also referred to a line of authority which has held that a contractor is liable to third persons for damages incurred as a result of negligent construction or design. These cases have held that privity of contract is not necessary in order to maintain the action, since liability is based upon an independent tort duty imposed by law. See, *e.g., Talley v. Skelly Oil Co.* (1967), 199 Kan. 767, 433 P.2d 425. This duty is imposed when it is foreseeable or probable that a negligent behavior will result in injuries to third parties. *Johnson v. Oman Construction Co.* (Tenn.1975), 519 S.W.2d 782.

While this authority has been recognized in this state, *Jackson v. Franklin* (1988), 51 Ohio App.3d 51, 554 N.E.2d 932, it simply is not applicable to the facts of this case. A perusal of the cases which impose this duty shows that it was designed to protect third parties from injuries to the person or to personal property. In this case, though, appellants essentially seek to recover economic loss resulting from defeated consumer expectations. This distinction is consistent with the general rule that economic loss is only recoverable in contract, not in tort. See *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 537 N.E.2d 624.

When a motion for a directed verdict is made before any evidence has been submitted, then the test for determining the merits of the motion is the same as that for a motion to dismiss for failure to state a claim. 2

Baldwin, Ohio Civil Practice (1988) 53, Section 39.06. Pursuant to the foregoing analysis, appellants failed to allege sufficient facts to state a claim against appellee Keeney. Accordingly, their fourth assignment of error is not well taken.

Unlike Keeney, Evans did not make his motion for a directed verdict until appellants had rested. Civ.R. 50(A)(4) states the standard which must be applied when the motion is made at that stage of the proceedings:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

Under their fifth assignment of error, appellants maintain that the evidence they introduced was sufficient to warrant the denial of Evans' motion. As noted before, appellants had asserted two claims against Evans. In the first, appellants claimed that Evans had been negligent in the design and the construction of the old bridge. In support of this particular claim, appellants now emphasize that the fact that the bridge had collapsed twice was sufficient to establish that it was defective.

However, the fact that the bridge had collapsed previously does not establish that appellee Evans was negligent. Since appellant did not present any expert testimony concerning the reason why the bridge failed, the record is devoid of any evidence showing that the problems were caused by an inherent flaw. It may seem like a strong possibility, but other explanations are not necessarily ruled out.

Appellants' second claim was based on an allegation of fraud. This claim was centered upon a statement Evans allegedly made about the bridge while appellants were inspecting the house. During her direct testimony, the realtor who showed the house stated that she asked Evans, in the presence of appellants, whether he had had any problems with the bridge. According to the realtor, Evans replied that he had not had any problems and that the bridge had supported a heavy truck.

During cross-examination, the realtor vacillated as to the exact question she had asked Evans. Specifically, the following exchange occurred concerning the exact question which was asked:

"Q.  * * * All I want to know is, ma'am, maybe this is important, okay, is—did you have a perfect recall of each and every word that was said?

"A. No, I don't.

"MR. THOMAS: Objection, Your Honor.

"A. No. If that is what you want, I couldn't guarantee it.

"THE COURT. Overruled."

This testimony shows that the realtor was uncertain as to whether she actually asked Evans if he had had any "problems" with the bridge. Moreover, appellants stated in their own testimony that they were not sure as to what Evans had said. Thus, the record contains, at best, self-contradictory and vacillating evidence in showing that Evans misled appellants as to the condition of the bridge.

In relation to the second claim, appellants submit that the mere fact that Evans failed to inform them of the prior problems with the bridge was sufficient to show a misrepresentation on his part. This argument is based upon the position that Evans knew the bridge was inherently flawed. Again, though, this court would note that appellants did not present any evidence demonstrating that the bridge was indeed inherently flawed. Accordingly, we conclude that appellants' fifth assignment of error is also without merit.

Under their final assignment of error, appellants contend that the trial court erred in excluding portions of the testimony of a second witness, Albert Saari. At the time of the trial, Saari was the Lake County Sanitation Engineer. When Evans first decided to build a house on the property, he consulted Saari concerning the proposed bridge. After consulting a second engineer, Saari gave Evans advice as to the design of the bridge.

During direct examination, the trial court permitted appellants' counsel to question Saari on the basic characteristics of the property, including the creek. The court also allowed Saari to present testimony concerning basic engineering principles, including the properties of flowing water.

However, the court did not permit Saari to state what the second engineer told him about the bridge. More importantly, Saari was not allowed to testify as to the design of the bridge or about the advice he had given to Evans.

In arguing that the court erred in excluding this testimony, appellants argue that Saari should have been allowed to state the advice which he gave to Evans. This aspect of appellants' argument clearly has merit. Saari's advice is certainly relevant to the issue of the actual design and construction of the bridge.

Yet, in the proffer concerning Saari's proposed testimony, appellants' counsel did not state what advice Saari had supposedly given Evans. Instead, counsel merely stated that if Saari had been allowed to testify, he would have stated that the opening of the bridge "should" have been as large as another

bridge located upstream. The use of the word "should" implies that the crux of Saari's testimony would have been that the bridge was not constructed in accordance with the proper design.

█ However, a review of Saari's testimony shows that Saari was not qualified to testify as an expert on bridges. Although he was an engineer, it was never established that Saari's expertise extended to bridges. Thus, under our analysis in the first assignment, Saari was not qualified to render an opinion on the quality of the design of the actual bridge.

█ In their appellate brief, appellants assert that Saari would have testified that he told Evans to make the opening of the bridge as large as the other bridge upstream. Appellants then argue that since the opening was not built in that fashion, negligence would have been established. This argument is flawed, though, since appellants never presented any expert testimony stating that the opening had to be a certain size. The fact that Evans did not follow Saari's advice does not, in and of itself, establish negligence.

Pursuant to the foregoing analysis, it follows that appellants' proffer was not sufficient to demonstrate that they were prejudiced by the trial court's rulings on Saari's testimony. Accordingly, their sixth assignment of error is not well taken.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

JOSEPH E. MAHONEY and FORD, JJ., concur.