DECISION AND JUDGEMENT ENTRY
Appellants, Chris Evans and Ginger Evans, appeal from the decision of the Jackson County Court of Common Pleas granting summary judgments in favor of appellee Mellott Manufacturing Company, Inc. [hereinafter Mellott] and appellee Lyons Saw Mill Logging Equipment Supplies, Inc. [hereinafter Lyons].
We affirm the grant of summary judgment to appellee Lyons and reverse the grant of summary judgment to appellee Mellott.
 Statement of the Case
Superior Hardwoods of Ohio, Inc. [hereinafter Superior], owned by Emmett Conway, employed appellant Chris Evans [hereinafter Evans] at a sawmill it owned near Wellston, Ohio. In April 1994, Emmett Conway contacted David White, a Lyons salesman, about the purchase of a new debarker. David White supplied Emmett Conway with drawings and specifications of the equipment from the Mellott catalog.
The debarker, as the name indicates, is a piece of equipment designed for the removal of bark from logs prior to the logs being fed into the saws inside the mill. Superior's old debarker was attached directly to the sawmill. However, because of the dust and debris produced by this machinery, much of which ended up inside the mill due to this placement of the debarker, Superior decided to install the new debarker some distance from the sawmill, using two conveyors, or "log troughs" to feed logs into the mill. Therefore, when Emmett Conway placed an order with Lyons for a new debarker, he also ordered two Model WD120 log troughs and a "kicker," all to be manufactured by Mellott. Mellott shipped the equipment directly to Superior at the site of its sawmill, near Wellston. Save for installation of certain concrete pads by a local contractor, Superior's maintenance crew did all the work to install the equipment during the week of Thanksgiving, November 1994.
Operation of this newly installed equipment, manufactured and supplied by Mellott, was basically as follows. The operator of the debarker sat in a cab and used chains and rollers to bring the logs into that machine. Once the bark was removed from the logs, the debarker rolled the logs into the first log trough. Each operator was responsible for lubrication of the debarker, or the chains in the log troughs, while operating the debarker.
Each log trough, or conveyor, is in a shape of a wide "V," with a flat bottom, and angled sides. Each of the angled sides, about eighteen inches in width, extended the length of the trough. One trough was thirty feet long, the other thirty-five feet long. A wide, flat, continuous length of chain ran through the bottom of each of the troughs. On each side of this chain were horizontal projections, or "dogs," that kept the chain centered in the flat bottom of the trough. The logs would ride atop these chains, through the troughs, to the "kicker." At the saw mill end of the trough, the "kicker" would eject the logs from the trough and roll them into the sawmill.
At the end of the first trough, the chain for that trough wrapped around a sprocket and tensioning device, which required periodic adjustment. When the Superior maintenance crew installed the troughs, they left a gap of approximately one foot between the end of this first trough and the beginning of the second trough to accommodate this adjustment procedure. In order to provide clearance for the "kicker" mechanism, Superior mounted the two troughs above ground. The troughs were level with one another, with the top of the first trough being approximately five and one-half feet above ground at the deck of the debarker. Due to the slope of the ground, the lowest point of the second trough, nearer the sawmill, was about three feet above ground. There were no ladders or walkways to provide access to these troughs. Deposition testimony from several Superior employees indicated that they gained access to the top of both the troughs by climbing onto the first trough from a catwalk attached to the deck of the debarker.
Evans began work at Superior in July 1994. Sometime in October 1994, Superior reassigned Evans from first shift to second shift and designated him as the operator of the debarker. His normal shift was from 5:00 p.m. to 3:30 a.m. the following morning, four days a week. He was to shut down the machinery at the end of his shift, with the employees on the first shift restarting the equipment the following morning.
During the first few weeks of operation of this new Mellott equipment, Superior's maintenance and supervisory personnel discovered that moisture would accumulate in these exposed log troughs overnight, freezing the chain to the metal surface of the trough. When this happened, a torch and a crowbar were required to break the chain loose, in order to start the machinery the next morning. Therefore, the mill supervisor, Karl Anthony "Tony" Simmering, instructed the second shift debarker operators to lubricate the chains with a mixture of used motor oil and diesel fuel at the end of their shift. Evans initially turned off the chain drives for this procedure. However, the lubricated chains still froze to the deck of the trough. Thereafter, Tony Simmering specifically instructed Evans to lubricate the chain while it was moving. Simmering claimed that the chain could be lubricated from the ground by pouring the oil and fuel mixture from a five gallon bucket into the trough.
James lively was a maintenance engineer with Superior who helped to install the Mellott equipment in 1994. His deposition testimony indicated that the only effective way to lubricate the chain was to walk the length of the log troughs, pouring the oil and fuel mixture directly onto the chain. Hively and Jeffrey Woods, another debarker operator who trained Evans on the Mellott equipment, also testified that they lubricated the chains in this fashion twice per week, even during the summer, to prevent wear. Woods testified his normal practice was to stop the chains before lubrication, but conceded that, on occasion, he would lubricate the chains while they were running and in motion. Woods also indicated that it was difficult to lubricate the chains properly unless one was on top of the troughs. Douglas Dickens, who worked as a supervisor during the period of Evans' employment, testified in his deposition that he could straddle the chain by walking on the sloped sides of the troughs. Evans, in his deposition, indicated that he rode on the moving chain, lubricating the bottom of the troughs rather than the chains.
On December 19 and December 20, 1994, a night that was cold with freezing rain, Evans was assigned as the second shift debarker operator. While lubricating the chains at the conclusion of his shift, Evans slipped as he stepped from the first trough to the second trough. His leg fell through the gap between the two troughs, breaking his ankle and several bones in his foot and severely injuring tendons in his foot, ankle and calf, as well as a muscle in his calf. Although Evans did not become entangled in the chain before he fell, the "dogs" on the return loop of the chain caused some of the injuries to his leg. Eventually, reconstructive surgery was required to transplant a muscle from his back to replace the injured muscle in the calf of his leg.
Evans and his wife, Ginger Evans, filed an action in June 1996 against Mellott and Lyons, asserting claims of product liability, negligence and loss of consortium.[1] The appellants alleged that Mellott manufactured defective equipment and sold this equipment to Lyons, who then sold it to Superior, Evans' employer. The appellants asserted claims arising under Ohio's product liability statutes, R.C. 2707.71, et seq. Specifically, the appellants alleged that Mellott and Lyons were strictly liable for design defects in the equipment and failed to warn Evans of the hazards created by operation of this equipment. Upon completion of discovery, both Mellott and Lyons moved for summary judgment. The trial court granted these motions of both appellees without further comment, whereupon the appellants timely filed this appeal. Appellants raise two assignments of error:
FIRST ASSIGNMENT OF ERROR:
 THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT, MELLOTT MANUFACTURING CO., INC.
 SECOND ASSIGNMENT OF ERROR:
 THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT, LYONS SAW MILL 
LOGGING EQUIPMENT SUPPLIES, INC.
 Opinion
Our review of a decision by the trial court to grant summary judgment is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588, 641 N.E.2d 265, 271; Smiddy v. The WeddingParty, Inc. (1987), 30 Ohio St.3d 35, 506 N.E.2d 212. We review a grant of summary judgment independently and without deference to the determination of the trial court. Brown v. Scioto Cay. Bd. of Commrs.
(1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1158. However, summary judgment is a procedural device that terminates litigation before trial. Therefore, we should uphold any award of summary judgment cautiously, with any doubts resolved in favor of the nonmoving party. See Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359, 604 N.E.2d 138, 140.
In reviewing the grant of a summary judgment motion by the trial court, we apply the same standard applied by the trial court. Maustv. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107,614 N.E.2d 765, 768. Before summary judgment may be granted under Civ.R. 56(C), the trial court must determine that:
 1. No genuine issue as to any material fact remains to be litigated;
 2. The moving party is entitled to judgment as a matter of law; and
 3. It appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.
State ex rel. Parsons v. Fleming (1994),68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379, citingTemple v. Wean United, Inc. (1977), 50 Ohio St.2d 317,327, 364 N.E.2d 267, 274.
The moving party must specifically point to some evidence that demonstrates the nonmoving party cannot support its claim. Dresher v.Burt (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274. If the moving party meets this burden, then the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact for trial. Vahila v. Hall (1997), 77 Ohio St.3d 421,429, 674 N.E.2d 1164, 1171. A motion for summary judgment forces the nonmoving party to produce evidence on issues for which that party bears the burden of production at trial. Wing v. Anchor Media, Ltd.of Texas (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. The nonmoving party must also present specific facts showing that there is a genuine issue for trial, and may not merely rely upon the pleadings or upon unsupported allegations. Id. at 111,570 N.E.2d at 1099.
As previously stated, the appellants' complaint alleged a claim of product liability under R.C. 2307.71 et seq., based upon Mellott's negligent manufacture and design of the log troughs, and Lyons' sale of these defective products to Superior. Codified in 1988, the Ohio Products Liability Act, R.C. 2307.71 et seq., provides:[2]
 Any recovery of Compensatory damages based on a product liability claim is subject to sections 2307.71 to 2307.79
of the Revised Code. R.C. 2307.72(A)
We will note, however, that the common law action of negligent design survived the passage of the product liability act. Carrel v.Allied Products Corp. (1997), 78 Ohio St.3d 284, 677 N.E.2d 795, paragraph one of the syllabus. It is well settled that a plaintiff cannot recover on a claim for product liability in Ohio unless a preponderance of the evidence demonstrates all of the following:
 1. There was, in fact, a defect in the product manufactured and sold by the defendant;
 2. Such defect existed at the time the product left the hands of the defendant; and
 3. The defect was the direct and proximate cause of the plaintiff's injuries or loss.
 Shaw v. Toyotomi Am., Inc. (1995), 101 Ohio App.3d 54, 57, 654 N.E.2d 1337, 1339, citing State Auto. Mut. Ins. Co. v. Chrysler Corp. (1973), 36 Ohio St.2d 151, 304 N.E.2d 891, paragraph two of the syllabus
A product liability claim under the act is defined at R.C.2307.71(M) as a claim for recovery of compensatory damages from a manufacturer or supplier for physical injury arising from any of the following:
 1. The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
 2. Any warning or instruction, or lack of warning or instruction, associated with that product;
 3. Any failure of that product to conform to any relevant representation or warranty.
 II Mellott Manufacturing Co., Inc.
Mellott is a family owned manufacturer of sawmill equipment located in Mercersburg, Pennsylvania. Mellott moved for summary judgment on June 19, 1998, asserting four bases for its motion. As we noted above, the trial court granted Mellott's motion without further comment.
Mellott asserted that appellants' claims should fail because they failed to produce any evidence of a defect in the products it delivered to Superior. Mellott disputes the adequacy and qualifications of appellants' expert, Gerald Rennell. Mellott argues that appellants failed to establish that a defect in its products was the direct and proximate cause of the accident and subsequent injuries to Evans.
Finally, Mellott asserts that the danger encountered by Evans on his job was open and obvious and a risk he voluntarily assumed by riding the chain while lubricating the trough. Mellott contends as well that Superior created the danger encountered by Evans. Mellott notes that the sawmill design and layout was created by Emmett Conway, the president of Superior, while Superior's supervisor, Tony Simmering, required Evans to lubricate the chain while the machinery was in operation.
Appellants argue that Mellott is responsible under R.C.2307.73(A)(1) for defects in "design or formulation" and defects arising from inadequate warnings or instructions. They argue further that R.C. 2307.75(A)(1) provides that a product is defective if the foreseeable risk associated with its design exceeded the benefits of the product's design. Appellants also argue that Mellott is liable because the product was more dangerous than the ordinary consumer would expect it to be, when used in a manner reasonably foreseeable to the manufacturer. See R.C. 2307.75(A)(2).
In cases arising before the enactment of the Ohio Products Liability Act, the Supreme Court of Ohio established the risk-benefit standard and the consumer-expectation standard as alternative tests to establish manufacturer liability. State Farm Fire Cas. Co. v.Chrysler Corp. (1988), 37 Ohio St.3d 1, 7, 523 N.E.2d 489, 495. See, also, Perkins v. Wilkinson Sword, Inc. (1998), 83 Ohio St.3d 507,700 N.E.2d 1247.
From our review of the record, appellants' consumer-expectation argument must fail. As Jeffrey Wood noted, common sense would tell you "[T]hat you don't get on that chain when it's moving. If a five ton log can't stop it, your leg is not going to." However, appellants are correct that the defense of assumption of the risk is not available when the employee is required to encounter the risk while performing normal job duties. Carrel, supra, at paragraph two of the syllabus; Cremeans v. Willmar Henderson Mfg. Co. (1991),57 Ohio St.3d 145, 566 N.E.2d 1203.
Mellott argues as well that it cannot be held responsible for any failure to provide a guard over the sprocket at the end of the first log trough. Mellott claims that, as a manufacturer of sawmill equipment, it is not liable to provide a guard where the nature of the guard required depends upon the particular installation. Mellott cites Mark v. Mellott Mfg. Co., Inc. (1995), 106 Ohio App.3d 571,666 N.E.2d 631. The injury in that case was the result of projecting screws in an unguarded mandrel on a rotating hydraulic pump that caught the plaintiff's clothing.
Appellants' expert, Gerald Rennell, testified that the log trough was defective primarily because the chain would freeze, and the design of the trough did not allow safe access to the top of the trough and chain. Samuel Mellott, the company president, claimed to have no knowledge of problems with the chains freezing in Mellott troughs. Gerald Rennell testified that he called sawmills in both southern Ohio and northern Michigan and found several sawmills with similar log troughs. These sawmill operators reported that the chains would routinely freeze to the trough in cold weather, requiring the use of pry bars, torches and even a jackhammer to break the chains loose. One operator reported installing a canopy over the trough to prevent freezing problems. Rennell did not, however, identify the manufacturers of the troughs in use at these other sawmills which he contacted.
Rennell concluded that the design of the Mellott log troughs was defective. From his investigation, he concluded that the freezing of the chain in log troughs of this ilk was a common industry problem and was, therefore, foreseeable by the designer-manufacturer. He further stated that a guard covering the exposed sprocket and chain at the end of the first trough may have prevented this accident. He did indicate and recommend, however, that the better approach would be to install a catwalk alongside the log troughs, with a handrail, to allow safe access to the log troughs for lubrication and other maintenance. He also suggested installation of a remote lubrication system for the chain and cutting drain holes in the pan to prevent freezing.
Dale Mellott, Mellott's vice-president, and the brother of Samuel, testified that some of the log troughs manufactured by Mellott in the past had been equipped with UHMW[3] plastic liners at the request of the customer. Dale Mellott further indicated that the customer requested this material for use on a long trough to reduce the wear on the chains and the demands on the drive system. This material is slippery, allowing a smaller drive system for the log chains. Dale quoted the installed price of this material at $50 to $60 per foot, substantially more than the metal troughs purchased by Lyons. Neither Dale Mellott nor Samuel Mellott recalled a request from any customer for the addition of a walkway or canopy to protect the log trough. They noted that access to the side of the trough is required to allow loaders to remove jammed logs. However, Rennell, appellants' expert, noted that Superior had installed a catwalk alongside the junction of the two troughs after the accident.
Mellott disputes Gerald Rennell's qualifications, noting that he has never designed, built or repaired sawmill equipment. Rennell was neither trained as a professional engineer, nor graduated from college. Rennell worked for several years at General Motors in the safety department, where he received about eighty hours of classroom training. Rennell later worked for an insurance company in its loss control division for five years.
Mellow cites Vistein v. Keeney (1990), 71 Ohio App.3d 92,593 N.E.2d 52; Behanan v. Desco Distrib. Co. (1994),98 Ohio App.3d 23, 647 N.E.2d 830; and Kitchens v. McKay (1987),38 Ohio App.3d 165, 528 N.E.2d 603, to support its argument that Rennell was not properly qualified to issue an expert opinion in this action.
Appellants assert that Rennell is qualified in the field of safety engineering, and the ultimate test regarding the admissibility of Rennell's testimony as an expert is whether the witness's testimony will aid the trier of the fact. An expert need not be the best witness on the subject. See Alexander v. Mt. Carmel Medical Center
(1978), 56 Ohio St.2d 155, 159, 383 N.E.2d 564, 566. As a general rule, a witness can still qualify as an expert even though he is not a specialist in a particular area of a field of expertise. Vistein v.Keeney, 71 Ohio App.3d at 99, 593 N.E.2d at 56.
Appellants insist that Rennell's opinion created a material question of fact as to the liability of Mellott for design defects. However, it is apparent that appellants, through their expert, seek to impose a legal duty upon Mellott. The existence of a duty in a negligence case is a question of law to be determined by the court.Mussivand v. David (1989), 45 Ohio St.3d 314, 544 N.E.2d 265. The fact that Rennell stated these opinions does not alone suffice to impose a legal duty upon appellant. See Sikorski v. Link Elec. Safety Control (1997), 117 Ohio App.3d 822, 831, 691 N.E.2d 749, 755. Expert testimony regarding matters of law is not appropriate because the court may not abdicate its role as finder of law. Id. at 831,691 N.E.2d at 755, citing Payne v. A.O. Smith Corp. (S.D.Ohio 1985),627 F. Supp. 226, 228-29.
Mellott also argues that the installation design for their equipment at the Superior sawmill did not originate with them, nor was it under Mellott's control. Mellott argues that the debarker and log troughs were standard items which Emmett Conway, Superior's president, selected out of the Mellott catalog. Although Mellott conceded that it supplied "footprint" drawings, showing equipment dimensions, with Superior's name on these drawings, it insists that it did not intend these drawings as specific diagrams for the installation of the equipment.
Robert Hoover, the Mellott draftsman who prepared these "footprint" drawings of the equipment acquired by Superior, including the troughs, testified that the Model WD120 log troughs ordered by Superior were a standard Mellott design. Since each customer specifies the length of the trough. Hoover would modify the standard shop drawings by "stretching" them as necessary to meet the dimensions requested by the customer. Hoover received training in automatic computer assisted design, and he used such "auto-CAD" equipment at Mellott. Hoover testified that the modified drawings would normally bear the customer's name on the label printed on each diagram. However, the only modification to the standard Mellott design would be to the length of the trough in this case.
In Ohio, it is not necessary to establish either that a product is "unreasonably dangerous" or that the product failed to operate properly and as intended. See discussion in Perkins, supra, and Knitzv. Minster Machine Co. (1982), 69 Ohio St.2d 460, 432 N.E.2d 814. A product may be found defective in design "if the benefits of the challenged design do not outweigh the risk inherent in such design."Id. at the syllabus. The Supreme Court of Ohio has held that "the public interest in human life and safety can best be protected by subjecting manufacturers of defective products to strict liability in tort when the products cause harm." Leichtamer v. Am. Motors Corp.
(1981), 67 Ohio St.2d 456, 464-465, 424 N.E.2d 568, 575.
Prior to further analysis of the propriety of the rulings in the court below, it is necessary that we seek to establish the proximate cause of Evans' injuries. Evans admits that he was riding the log chain, rather than walking along the slanted edges of the log trough. Admittedly, some of his injuries resulted from contact with this chain. However, contact with the chain was not the cause of this accident; rather, contact with the chain resulted from the accident.
This accident occurred when Evans slipped while stepping over the gap between the two log troughs. James Hively testified in his deposition that the log troughs could be hazardous when icy and that the hazard of falling between the troughs was "a risk we took" as part of the job. Hence, the hazard that caused Evans to fall between the two troughs was that he was attempting to navigate the log troughs during icy, freezing weather.
On a motion for summary judgment, the trial court should not weigh the evidence or assess the credibility of witnesses. Questions of credibility must be resolved in the plaintiff's favor. See Perez v.Scripps-Howard Broadcasting Co. (1988), 35 Ohio St.3d 215, 218,520 N.E.2d 198, 202; Cincinnati v. Ohio Council 8, Am. Fedn. ofState, Cty. Mun. Emp., AFL-CIO (1994), 93 Ohio App.3d 162, 165,638 N.E.2d 94, 96; McGuire v. Mills (Aug. 30, 1999), Ross App. No. 98CA2462, unreported. We follow the same standard as the trial court:Smiddy, supra; Bank One of Portsmouth v. Weber (Aug. 7, 1991), Scioto App. No. 1920, unreported. We do not evaluate appellants' likelihood of success at trial. We must construe the evidence in their favor as the nonmoving parties and not weigh such evidence, but merely determine if a genuine dispute as to the material facts exists.
Therefore, we need not consider Mellott's objections to the qualifications of Gerald Rennell as an expert witness. The issue raised is whether the Mellott Model WD120 log trough is defective in design because the conveyor chain freezes to the trough in cold weather and because of the lack of safe access to this trough and chain conveyor. Rennell's deposition testimony directly raised the question of a design defect in the Mellott Model WD 120 trough. However, the testimony of several Superior employees inferentially raised this same issue. A trial court should not grant summary judgment if an inference in favor of the nonmoving party can be drawn from the facts. See Viock v. Stowe-Woodward Co. (1983),13 Ohio App.3d 7, 15, 467 N.E.2d 1378, 1386; Klingovsky v. Mestek,Inc. (Dec. 1, 1998), Jefferson App. No. 97-JE-26, unreported.
We also note that Superior erected a catwalk alongside the junction of the two log troughs after the accident, evidenced by Gerald Rennell's observations and a photograph taken by him that appears in the record.[4] Normally, evidence of subsequent remedial measures is not admissible under Evid.R. 407. However, Evid.R. 407 does not apply to products liability cases based upon strict liability in tort. McFarland v. Bruno Mach. Corp. (1994), 68 Ohio St.3d 305,626 N.E.2d 659, syllabus.
We conclude, therefore, that the appellants have established a material question of fact as to whether the design of the Mellott log trough was defective because of the tendency of the chains to freeze in cold, wet weather. This, in turn, raises three further questions of fact. First, whether the foreseeable use of the log trough would require lubrication of the conveyor chains in inclement weather. Second, whether the risk created to operators and maintenance personnel by the lack of access to the drive chain for lubrication created a foreseeable risk of injury. Finally, whether the benefits of the design of the Mellott log trough outweighed the risks created by this design.
 Summary judgment is appropriate only where a product is used in a capacity which is clearly unforeseeable by the manufacturer and completely incompatible with the product's design. Cox v. Oliver Mach. Co. (1987), 41 Ohio App.3d 28, 534 N.E.2d 855. Foreseeable uses of a product, foreseeable risks associated with a product, benefits associated with a product, and consumer expectations regarding a product's uses and risks are ordinarily all factual questions. The determination whether a design defect exists involves a balancing of these factual issues. Therefore, summary judgment will rarely be granted in design-defect cases when any of these elements is disputed.
 Welch Sand Gravel, Inc. v. O K Trojan, Inc. (1995), 107 Ohio App.3d 218, 225, 668 N.E.2d 529, 533-534.
We conclude, therefore, that the appellants met their burden underWing, supra, to establish the existence of specific facts sufficient to establish genuine issues for trial.
Accordingly, we sustain appellants' First Assignment of Error and REVERSE the judgment of the trial court granting summary judgment to Mellott Manufacturing Co., Inc.
 II Lyons Saw Mill Logging Equipment Supplies, Inc.
Lyons, based in Little Falls, New York, is a distributor of sawmill equipment and supplies. Emmett Conway contacted Lyons regarding the purchase of a debarker for Superior's Wellston sawmill. Dave White was the Lyons salesman assigned to Superior.
Appellants assert four bases for the imposition of liability on Lyons:
 1. Lyons created or furnished Mellott with the design used to create the Mellott debarker and log trough system installed at Superior's Wellston sawmill.
 2. Lyons is responsible for the failure to warn Evans of the dangers associated with the log troughs, and this failure to warn is a proximate cause of the injury.
 3. There is a material question of fact whether or not Mellott will become insolvent, citing R.C. 2307.78(B)(2).
 4. There is material issue of fact whether Evans assumed the risk of his injuries by his actions.
We have hereinbefore addressed appellants' final argument regarding assumption of the risk, in the preceding section of this opinion. Even if Evans assumed the risk of his injury, by attempting to lubricate the log trough in bad weather, this defense is not available when the employee is required to encounter the risk while performing normal job duties. Carrel v. Allied Products Corp.,78 Ohio St.3d 284, 677 N.E.2d 795, paragraph two of the syllabus.
Appellants' second issue attempts to apply a failure to warn claim to a supplier. We found above that this is not a "failure to warn" case, but instead a "risk/benefit" case. Further, this is a duty assigned to the manufacturer. R.C. 2307.78(A) limits a supplier's liability in negligence or misrepresentation claims. Selvey v. ToledoEdison (Oct. 10, 1997) Seneca App. No. 13-97-14, unreported, citingWelch Sand Gravel, Inc. v. O K Trojan, Inc., supra,107 Ohio App.3d at 228-229, 668 N.E.2d at 536.
Lyons, as the supplier of the equipment, argues that R.C. 2307.78
limits its liability. Under R.C. 2307.78(A), as it existed at the time of the accident:
 (A) Subject to division (B) of this section, a supplier is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, that either of the following applies:
 (1) The supplier in question was negligent, and that negligence was a proximate cause of harm for which the claimant seeks to recover compensatory damages;
 (2) The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages. A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation.
Stacy Mellott, Mellott's corporate secretary, testified in her deposition that Mellott shipped the equipment directly to Superior. Appellants do not argue that the Mellott products failed to conform to any representation made by Lyons, or that any failure to conform was the proximate cause of Evans' injuries. Clearly, R.C.2307.78(A)(2) is inapposite in this case. Appellants must, therefore, establish negligence on the part of Lyons, under R.C. 2307.78(A)(1), to impose liability on Lyons or to establish the existence of a genuine issue of material fact for trial sufficient to withstand a motion for summary judgment.
To establish negligence, appellants must demonstrate that negligence by Lyons created the product defect which was the proximate cause of the injury in question. Shea v. BASF (Aug. 8, 1995), Paulding App. No. 11-95-2, unreported. In Shea, the plaintiff claimed damage from contaminated herbicide. He was unable to establish, however, that the contamination was the result of negligence by either the manufacturer or the supplier.
The testimony of David White established that Lyons did not install, or supervise the installation of, the Mellott debarker and log troughs. White visited Superior shortly after the installation of the equipment, but the purpose of his visit was merely to inquire about any problems Superior had encountered with the new equipment.
Appellants raise two specific exceptions to R.C. 2307.78(A)(1), set forth under R.C. 2307.78(B). R.C. 2307.78(B) provides that a supplier of a product is subject to liability for compensatory damages based on a product liability claim as if it were the manufacturer of that product. "supplier liability," as set forth in R.C. 2307.78(B), is one of substitution, holding the supplier liable instead of an absent, culpable manufacturer. See Dobbelaere v. Cosco (1997),120 Ohio App.3d 232, 245, 697 N.E.2d 1016, 1024. R.C. 2307.78(B)(1) imposes this "substituted liability" upon the supplier if the manufacturer is not subject to the jurisdiction of Ohio courts, while R.C. 2307.78(B)(2) imposes liability upon the supplier if the manufacturer is insolvent.
We will note that Mellott, a Pennsylvania corporation, initially disputed the jurisdiction of the Ohio court in its answer to the appellants' complaint. However, it did not pursue this argument in its motion for summary judgment or on appeal. Hence, we will conclude that Mellott, as the manufacturer of the products in question, is subject to judicial process in this state, thereby precluding application of R.C. 2307.78(B)(1) in this case.
The appellants claim that R.C. 2307.78(B)(2) imposes liability upon Lyons because "[t]he claimant will be unable to enforce a judgment against the manufacturer of that product due to actual or asserted insolvency of the manufacturer." Appellants assert that because Mellott is uninsured, they will not be able to collect any judgment obtained against that company. See Pfaff v. Benjamin Air Rifle Co.
(Dec. 11, 1997), Cuyahoga App. No 71998, unreported.
The record does not support appellants' claim. Nothing in the record indicates that Mellott is insolvent, or that appellants, if successful at trial, will be unable to collect on their claim.Dobbelaere v. Cosco, 120 Ohio App.3d at 245, 697 N.E.2d at 1024. See discussion in Crego v. Baldwin-Lima-Hamilton Corp. (Feb. 27, 1998), Montgomery App. No. 16515, unreported.
Finally, appellants raise a claim under R.C. 2307.78(B)(5). This division imposes liability upon the supplier for a defective product where "the supplier in question created or furnished a manufacturer with the design or formulation that was used to produce, create, make, construct, assemble, or rebuild that product or a component of that product."
Dave White, the Lyons salesman, testified that Emmett Conway contacted him and specified what he wanted and how he wanted to install the equipment at Superior's Wellston sawmill. White supplied Conway with product information from the Mellott catalog. Conway specified the size of the debarker and the length of the conveyors that he needed. White supplied Conway with a quotation to fit Superior's needs. Lyons did not supply any schematic drawings or installation diagrams. Mellott supplied diagrams of the equipment, but these were basic dimension prints, not construction or engineering prints. These "footprint" or equipment drawings were basic drawings, similar to those sent out to any customer interested in this equipment.
Lyons employed a sales engineer, Jim Wulf, who could prepare installation prints if Lyons was to install the equipment it sold. However, White testified that Superior did not request Lyons to install the Mellott equipment, and Wulf did not prepare any drawings for Superior. Testimony from Superior employees indicated that Superior, not Lyons, installed the Mellott equipment at the Wellston sawmill.
As we noted above, Robert Hoover, the Mellott draftsman, testified that the Model WD120 log troughs ordered by Superior were a standard Mellott design. Hoover simply "stretched" standard shop diagrams on Mellott's computer-assisted drafting equipment to meet the dimensions specified by the customer. Normally, Mellott identified these new shop drawings by the customer's name, for the convenience of the shop employees.
We find that the record does not support appellants' argument that Lyons participated in the design or installation of the Mellott equipment.
We find, therefore, that appellants have failed to demonstrate any negligence on the part of Lyons, as supplier of the Mellott products. We find, as well, that appellants have failed to establish "substitution liability" of Lyons as a "manufacturer" under R.C.2307.78(B). Lyons neither designed nor installed the Mellott equipment. Nor has appellant established that Mellott is potentially insolvent. Appellants have failed to demonstrate any genuine issue of material fact regarding the asserted bases for supplier liability of Lyons, pursuant to R.C. 2307.78.
Accordingly, we OVERRULE appellants' Second Assignment of Error and AFFIRM the judgment of the trial court as to Lyons Saw Mill Logging Equipment Supplies, Inc.
We do find merit to appellants' First Assignment of Error. Accordingly, we REVERSE the judgment of the trial court as to appellee Mellott Manufacturing Co., Inc., and REMAND this portion of this matter to the trial court for further proceedings not inconsistent with the content of this opinion.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Opinion, the September 25, 1998 Judgment Entry of the Jackson County Court of Common Pleas dismissing Mellott Manufacturing Co., Inc., is reversed. This case is remanded to that trial court for further proceedings in accordance with the law and this opinion as to that appellee. It is ordered that the appellants recover of the appellee Mellott Manufacturing Co., Inc., their costs herein taxed.
For the reasons stated in our accompanying Opinion, the September 28, 1998 Judgment Entry of the Jackson County Court of Common Pleas dismissing Lyons Saw Mill Logging Equipment Supplies, Inc., is affirmed. It is ordered that the appellee Lyons Saw Mill Logging Equipment Supplies, Inc., recover of the appellants its costs herein taxed.
The Court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Jackson County Court of Common Pleas to carry this judgment into execution.
Harsha, J.: Concurs in Judgment Only, Kline, P.J.: Dissents with Opinion.
 _____________________ David T. Evans, Judge
[1] Superior Hardwoods, Inc., was not a party to this action. The trial court granted the "Joint Motion of the Parties for Order Requiring the Ohio Bureau of Workers [sic] Compensation be Joined as an Involuntary Party-Plaintiff."
[2] Portions of the act were amended effective January 27, 1997, by the passage in the 121st General Assembly of H.B. No. 350. However, the applicable law is that in effect at the time the action arose in 1994. See Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, 522 N.E.2d 489.
[3] Ultrahigh molecular weight plastic.
[4] Designated at the Rennell deposition as Defendants' Exhibit 14.