SIKORSKI, Appellant,

v.

LINK ELECTRIC AND SAFETY CONTROL COMPANY, Appellee.

[Cite as *Sikorski v. Link Elec. & Safety Control Co.* (1997), 117 Ohio App.3d 822.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 70187.

Decided Jan. 27, 1997.

*Michael J. Flament* and *Daniel J. Ryan,* for appellant.

*King & Ballow* and *Douglas R. Pierce; Weston, Hurd, Fallon, Paisley & Howley, Timothy D. Johnson* and *William H. Baughman, Jr.,* for appellee.

JAMES M. PORTER, Presiding Judge.

Plaintiff-appellant Michael Sikorski appeals from an order of the trial court granting summary judgment in favor of defendant-appellee Link Electric and Safety Control Company on plaintiff's product liability claim that defendant's safety device failed to protect him from injuries, including loss of his right arm and the fingers of his left hand during operation of a metal stamping press. Plaintiff claims that disputed issues of fact precluded summary judgment. We disagree and affirm the judgment for the reasons stated below.

The eight-hundred-ton metal stamping press on which plaintiff was injured was manufactured by Danly Machine Company and originally sold in 1956 to General Motors Corporation ("GMC"), which used it to stamp out metal panels for automobiles at its Fisher Body Division. In 1988, Tool Producers, Inc., a manufacturer located in Middleburg Heights, Ohio, purchased the press from a used machinery dealer, and it was installed and retrofitted for operation at Tool Producers in 1989. When it arrived at Tool Producers, the press had been completely disassembled, and Tool Producers had to "rebuild" the press. In rebuilding the press, Tool Producers sought to make the press "like new." To achieve this result, Tool Producers replaced many components of the press, including the brakes.

The press was used to form sheet metal between a set of dies. During the press cycle, the upper die (attached to the press ram or slide) descends and strikes the metal placed on the lower die (attached to the press bed). The press therefore contains a "point of operation" where the upper die strikes the metal placed on the lower die of the press. Section 1910.211(d)(45), Title 29, C.F.R. Under both the United States Occupational Safety and Health Administration Regulations ("OSHA") and the Ohio Administrative Code, Tool Producers was required to provide some means of safeguarding that point of operation. Section 1910.217, Title 29, C.F.R.; Ohio Adm.Code 4121:1–5–10.

During that installation process, Tool Producers elected to safeguard the press with a presence-sensing electronic device manufactured by Link and commonly known as a "Link Lite," which it purchased from Link's distributor, Pace

Enterprises. A Link Lite creates a vertical electronic "sensing field" in front of the point of operation of a press that, when interrupted, sends a stop signal to the press, thereby stopping the operation of the press before something or someone can enter the point of operation. The sensing field and the presence sensing device are also referred to as a "light curtain" or a "light screen." A Link Lite consists of two components, a light source and a light receiver. On the press in question, the light source was located on the right side of the press, and the light receiver was located on the left. The light receiver is the controlling portion of the Link Lite. The light receiver consists of a set of electronic components contained in a locked metal box:

Tool Producers had used Link Lites for years, stocked them in inventory, and installed them on other machinery in its plant. Tool Producers understood the Link Lites to be "universal," and not specifically designed for any particular press. However, Tool Producers also knew that it would have to manufacture special brackets for installing Link Lites "because each and every application is totally different." Tool Producers knew of the requirements for installing the Link Lites because Link provided a manual with the Link Lites and because Tool Producers knew of the OSHA regulation relating to the installation of presence-sensing devices. Tool Producers did not seek from Link any additional information concerning installation of the Link Lites, since it had the information contained in the Link Lite manual. Although Tool Producers believed that it provided Link with a drawing of the press, Link did not design the installation of the Link Lites. Tool Producers fabricated in house the brackets to accommodate the Link Lites on the press.

Both OSHA and the Ohio Administrative Code require that all presence-sensing devices be positioned a minimum distance away from a point of operation. Section 1910.217(c)(3)(iii)(e), Title 29, C.F.R.; Ohio Adm.Code 4121:1–5–10(D)(3)(c)(v). This minimum distance is calculated by using an equation that includes the stopping time of the particular press and the governmentally mandated assumption that the human body could move into the point of operation at a speed of sixty-three inches per second. *Id.* Essentially, the distance the presence-sensing device is placed from the point of operation is determined by how quickly the press can stop or brake. The government mandates this minimum distance in order to prevent a presence-sensing device from being positioned so close to the point of operation that a person could interrupt the sensing field and move into the point of operation before the press has time to stop. Therefore, the slower the stopping or braking time of the press, the further the presence-sensing device must be set away from the pinch point (or point of operation) so that the operator of the press cannot "beat the press" by getting through the light curtain and into the point of operation before the press

can stop. To assist its customers in complying with governmentally mandated minimum distance, Link provides a simple chart that shows precalculated minimum distances for positioning the Link Lite.

Because a presence-sensing device must be positioned a specific minimum distance away from the point of operation, in some circumstances the sensing field could be far enough from the point of operation that there would be room for an operator to stand between the sensing field and the point of operation. Under those circumstances, an operator would not benefit from the intended protection of the presence-sensing device. Therefore, the instructions provided with the Link Lite provide that in such a situation, "a physical obstruction to prevent the operator(s) from standing inside the Link Lite sensing field should be used. Alternatively, a secondary Link Lite, mounted horizontally and extending outward from the machine may be used to prevent the machine from cycling when someone is inside the primary sensing field."

In the process of retrofitting and installing the press, Tool Producers installed one Link Lite vertically at chest height ("primary sensing field" or "upper Link Lite") in front of the point of operation. The space between the press and the primary sensing field was large enough to allow a person to stand between the two without interrupting the primary sensing field. Tool Producers, however, also installed a second Link Lite about thigh high ("secondary sensing field" or "lower Link Lite") between the sensing field of the upper Link Lite and the point of operation. Although Tool Producers mounted the lower Link Lite vertically instead of horizontally, this in no way affected the operation of the sensing field or the safety function of the lower Link Lite: the vertical installation meant simply that the plane of the secondary sensing field created by the lower Link Lite was vertical rather than horizontal. Moreover, with this vertical installation, the space between the primary sensing field and the pinch point was narrow enough that plaintiff's expert, Richard Harkness, concluded that it was not physically possible for plaintiff to be between the primary sensing field and the point of operation without interrupting the secondary sensing field. In fact, at the time of the accident, plaintiff's body was interrupting the secondary sensing field. Therefore, in this case, the vertical installation of the lower Link Lite protected plaintiff as much as a horizontal installation.

In the summer of 1991, the plaintiff, Mike Sikorski, was nineteen years old and was home for the summer from George Washington University. He responded to an ad in the newspaper for a position with Cencor Temporary Services, a temporary help agency. He worked a couple of job assignments for Cencor customers and then was sent to Tool Producers. He reported in early July and was there approximately two weeks before his accident. Sikorski never received any training at Cencor and had not previously operated presses. During the two

weeks, Sikorski worked a couple of different jobs, and on the morning of July 12, 1991, was assigned for the first time to work on the Danly press that stamped out door panels for GMC vans. He was assigned to that position by Keith Reynolds, the supervisor of press operations at Tool Producers, who instructed Sikorski and four other individuals how the job was to be run.

The press was set up with two sets of dies, so that with each cycle of the press two stampings were done. The two sets of dies were set up beside each other. Plaintiff and one other member of the crew were each assigned a particular set of dies. Plaintiff was assigned the second or left set of dies. Sam Carmicle was assigned the first or right set of dies. The five-man crew's mode of operation was as follows: after the press would cycle, plaintiff would remove the piece of metal formed on his set of dies and hand it to a person behind him. Plaintiff would then receive from Carmicle another piece of metal that plaintiff would place in the second set of dies. Carmicle would place another piece of metal in the first set of dies. Plaintiff and Carmicle would then step away from the press by moving outside the Link Lite sensing fields and Carmicle would cycle the press by depressing a set of palm buttons. Although plaintiff was working on the press, he was not actually operating the palm buttons that controlled the press.

Shortly after 12:45 p.m. on July 12, 1991, during the operation, plaintiff, after setting a piece of metal on his dies and moving away from the point of operation, took the additional step of reentering the sensing fields to remove scrap metal from the point of operation. At that moment, Carmicle did not see plaintiff removing the scrap metal, and Carmicle depressed the palm buttons. Also, at that moment, because plaintiff was standing between the primary sensing field of the upper Link Lite and the press, he was not interrupting the primary sensing field. Plaintiff's body was, however, in a position to interrupt the secondary sensing field of the lower Link Lite.

Unfortunately, Tool Producers had deliberately bypassed the secondary sensing field of the lower Link Lite. Tool Producers had rewired the lower Link Lite so that it was nonfunctional. Because of this rewiring, when Carmicle depressed the palm buttons, the press cycled and injured plaintiff.

There was no evidence of any defect in the Link Lites on the press, and according to the evidence there was no failure of the Link products at the time of the accident. Plaintiff's expert agreed that the Link Lite is a good device but claimed that it was installed incorrectly. Link provides adequate instructions for the Link Lite and plaintiff's expert admitted that if Link's instructions had been followed, this accident would not have occurred.

It was undisputed that at the time of his injury, plaintiff was in a position to interrupt the secondary sensing field. Plaintiff's expert witnesses conceded that if the lower Link Lite had been in use, instead of bypassed, plaintiff would not

have been injured. One of plaintiff's experts agreed that there is not a safety system in the world that cannot be bypassed, disabled, or rendered nonfunctional. It was also recognized that no matter what type of safety system is used on a mechanical power press, there is always some possibility of injury. Finally, it was agreed that presence-sensing devices, such as the Link Lite, are effective means of guarding mechanical power presses.

Before this accident, plaintiff's experts had never heard of a presence-sensing device being rewired or "jumpered out" to bypass it. This process of rewiring the Link Lite to bypass it is not something that Link has ever advised, suggested, or instructed Tool Producers to do. Plaintiff's experts acknowledged that rewiring the Link Lite was a modification and a misuse of the Link Lite.

The lower Link Lite was rewired at the direction of Keith Reynolds, the supervisor in charge of press operations at Tool Producers. The wiring of the Link Lite was contained in a locked box, and press operators did not have a key to this box. There is no reason why the lower Link Lite could not have been used during the press operation on which plaintiff was injured. However, Reynolds stated that the lower Link Lite was rewired to bypass it in an effort to increase production speed.

Plaintiff filed his original complaint in this action on August 19, 1991 and a third amended complaint on December 1, 1992. The third amended complaint named six defendants: Danly Machine Company, Danly's successor, Tool Producers, Link, Caire Electric Company, and Pace Enterprises. A separate action against GMC was consolidated with this action. Plaintiff's claims against Link sounded in negligence, gross negligence, breach of warranty, and product liability.

On October 1, 1993, after substantial discovery in the case, six defendants (except Caire) moved for summary judgment. The trial court granted Link's motion on August 23, 1994.

Thereafter, plaintiff settled with various of the remaining defendants, and the case proceeded to trial against Tool Producers only on plaintiff's intentional tort allegations. A jury returned a verdict for plaintiff in excess of $4 million. The claims against all the parties having been finally disposed of, the plaintiff filed a timely appeal from the summary judgment in favor of Link.

Plaintiff's sole assignment of error states as follows:

"The trial court erred in granting summary judgment to defendant-appellee, Link Electric & Safety Control Company, in that the evidence and record before the court presented justiciable issues of fact for determination by a jury."

Under Civ.R. 56, summary judgment is proper when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to

judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion · is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. It is well settled that the party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265, 278; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140.

However, the nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991); 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099; *Celotex, supra,* 477 U.S. at 322–323, 106 S.Ct. at 2552–2553, 91 L.Ed.2d at 272–274. In accordance with Civ.R. 56(E), "a nonmovant may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial." *Chaney v. Clark Cty. Agricultural Soc.* (1993), 90 Ohio App.3d 421, 424, 629 N.E.2d 513, 515.

In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, the Supreme Court of Ohio modified the summary judgment standard as was applied under *Wing v. Anchor Media, Ltd. of Texas, supra.* Presently, under the new standard, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact or a material element of the nonmoving party's claim." *Dresher* at 296, 662 N.E.2d at 275.

This court reviews the lower court's granting of summary judgment *de novo. Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157 ("We review the judgment independently and without deference to the trial court's determination."). An appellate court reviewing the grant of summary judgment must follow the standards set forth in Civ.R. 56(C). "The reviewing court evaluates the record * * * in a light most favorable to the nonmoving party. * * * [T]he motion must be overruled if reasonable minds could find for the party opposing the motion." *Saunders v. McFaul* (1990), 71 Ohio App.3d 46, 50, 593 N.E.2d 24, 26; *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 741, 607 N.E.2d 1140, 1144.

Plaintiff claims that defendant had the duty to install or at least inspect the installation of the Link Lites. This argument has no merit.

In Ohio, products liability law began with the Supreme Court's decision in *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267; *Burrows v. Fastener Engineers, Inc.* (1992), 78 Ohio App.3d 388, 390, 604 N.E.2d 838, 839–840. In that case, the Supreme Court adopted the Restatement of the Law 2d, Torts (1965) 347, Section 402A. This section, as summarized by the court in *Cox v. Oliver Machinery Co.* (1987), 41 Ohio App.3d 28, 30, 534 N.E.2d 855, 858, states that "one who manufactures or sells a product in a defective condition is subject to liability for physical harm caused to the ultimate user * * * if the product is expected to and does reach the user * * * without substantial change in the condition in which it is sold." "Substantial change" has been defined as "any change which increases the likelihood of malfunction, which is the proximate cause of the harm complained of, and which is independent of the expected and intended use to which the product is put." *Kobza v. Gen. Motors Corp.* (1989) 63 Ohio App.3d 742, 745, 580 N.E.2d 47, 49.

In 1988, the Ohio General Assembly codified Ohio's product liability common law in R.C. 2307.71 through 2307.80. *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 661 N.E.2d 714 (claim against manufacturer for product defect alleging damages other than purely economic ones is preempted by product liability statutes); *McAuliffe v. W. States Import Co., Inc.* (Dec. 16, 1993) Cuyahoga App. No. 65297, unreported, at 5, 1993 WL 527880, reversed on other grounds (1995), 72 Ohio St.3d 534, 651 N.E.2d 957 ("State legislature codified product liability causes of action and such actions no longer exist at common law."). The statutes applicable hereto impose liability upon the manufacturer of a product "only if the claimant establishes" (1) a defect in the manufacture or construction, (2) a defect in design or formulation, (3) a defect due to inadequate warning or instruction, or (4) a defect because of the product not conforming to representations made by the manufacturer. R.C. 2307.73 through 2307.77. The product liability statutes provide that the product is defective only if the defect existed "when it left the control of its manufacturer." R.C. 2307.74 through 2307.77.

Neither party has cited case law for or against the proposition that a manufacturer has a duty to install or oversee the installation of its product nor has the legislature imposed such a duty on manufacturers. This is because of the long-standing principle that a manufacturer cannot be held liable unless the alleged defect existed at the time the product left the hands of the defendant. *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227, 230, 35 O.O.2d 404, 406, 218 N.E.2d 185, 188; *Bruns v. Cooper Indus., Inc.* (1992), 78 Ohio App.3d 428, 433, 605 N.E.2d 395, 398; *White v. Dealers Transit, Inc.* (1980), 4 Ohio App.3d 40, 44, 4 OBR 87, 92–93, 446 N.E.2d 460, 465–466. There is no contention of a defect in the Link Lite product when it was acquired by Tool Producers. In fact, the

Link Lites were properly installed by Tool Producers, but later Tool Producers disconnected the lower Link Lite to speed up production. Under federal and Ohio regulations, Tool Producers, the user of the press, which also assembled and installed it, was required to see that the Link Lites were "properly applied and adjusted." Section 1910.217(c), Title 29, C.F.R.; Ohio Adm.Code 4121:1–5–10(D)(1)(a).

Any defect that develops on machinery after it is delivered to a plaintiff's employer by reason of work done on the machine by the employer (such as installation) cannot be attributed to the manufacturer. *Keet v. Serv. Machine Co.* (C.A.6, 1972), 472 F.2d 138, 140. Even when a manufacturer ships a product unassembled, "knowing that a third party will complete the assembly process, the manufacturer cannot be held liable for a defect introduced by that third party." *Grover Hill Grain Co. v. Baughman–Oster, Inc.* (C.A.6, 1984), 728 F.2d 784, 789. If there is no duty to ship assembled products, a *fortiori*, there cannot be the greater duty of overseeing the installation of the product after shipping. The imposition of such a duty is a matter best left to the legislature.

Despite the lack of law to support plaintiff's claim of duty, he argues that his experts created an issue of material fact when they opined that Link had the duty to visit Tool Producers to ensure that the Link Lites had been properly installed. The fact that his experts stated these opinions does not create a legal duty on defendant. Whether a legal duty is owed or not is a question of law for the court to determine. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269–270; *Thomas v. Parma* (1993), 88 Ohio App.3d 523, 527, 624 N.E.2d 337, 339–340; *Phillips v. Garfield Hts.* (1992), 85 Ohio App.3d 413, 417, 620 N.E.2d 86, 89–90. Pursuant to Evid.R. 702, expert opinion testimony is proper only if it would "assist the trier of fact to understand the evidence or to determine a fact in issue." See, also, *Berry v. Motorists Mut. Ins. Co.* (1983), 13 Ohio App.3d 228, 232, 13 OBR 280, 284, 468 N.E.2d 922, 927 ("expert testimony must only be accepted when it is necessary to assist the trier of fact to understand a fact in issue"). Because the issue of whether a product's manufacturer has a duty to install its product is a legal not factual issue, plaintiff's experts' opinions concerning such a duty are not admissible. *Payne v. A.O. Smith Corp.* (S.D.Ohio 1985), 627 F.Supp. 226, 228–229 (expert testimony as to matter of law is prohibited because it would require the court to "abdicate its role as finder of law in this or any other case").

If this court were to accept plaintiff's theory imposing a duty on manufacturers to install or oversee every installation of its products, it would impose a severe burden on manufacturers. In effect, the manufacturers would have the continuing duty to visit customer sites and conduct periodic inspections to determine whether the end-users had properly installed the safety device. This proposition

could lead to onerous results, *e.g.*, overseeing the installation and maintenance of smoke detectors.

■ Because Link did not have a legal duty to install the Link Lite, plaintiff's case against Link fails at the duty threshold. However, even assuming *arguendo* that Link had an obligation to install or inspect the installation of the Link Lite, it is nevertheless clear that the installation was not defective and that the installation was not the proximate cause of this accident: it was the bypassing of the lower Link Lite that caused the accident. "A necessary element in all products liability cases is proof of a casual relationship between the alleged defect and the resulting injury." *Kelley v. Cairns & Bros., Inc.* (1993), 89 Ohio App.3d 598, 610, 626 N.E.2d 986, 994. All of plaintiff's experts agreed that had the lower Link Lites not been disabled, and had plaintiff's body been in the area of the lower Link Lite curtain, there was no question that the accident would not have occurred. The evidence showed that Tool Producers had disconnected the lower Link Lite and that plaintiff's body was in the area of the lower light curtain.

Instead of being required to oversee the installation of their products, manufacturers are required to provide adequate instructions on the installation of their devices. R.C. 2307.76. In this case, the experts agreed that the installation instructions were adequate. In any event, there is no dispute that Tool Producers properly installed the Link Lites and disabled one of the units in order to speed up production.

Plaintiff also seems to allege that the Link Lite was not adequately designed for use on the press, as the light field was not big enough to cover the size of the press.

■ Neither plaintiff nor his experts explain why a larger presence-sensing field was necessary or could have made any difference in this case when the Link Lite was disconnected. "To fix liability for a design defect, it remains incumbent upon a plaintiff to establish the element of causation." *State Farm Fire & Cas. Co. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 7, 523 N.E.2d 489, 495. The presence-sensing fields created by the existing Link Lites were big enough to prevent injury, except that the lower Link Lite had been bypassed and was not in use at the time of the accident. It is immaterial how large the presence-sensing field is if the user, Tool Producers, is going to rewire it to bypass it. In any event, it was established that plaintiff was interrupting the sensing field of the lower Link Lite; therefore, the lower Link Lite was clearly big enough.

If on the other hand plaintiff is suggesting that if the upper Link Lite had been bigger, *i.e.*, created a larger sensing field, there would have been no necessity for the lower Link Lite, he is clearly wrong. Federal and Ohio regulations required that the upper Link Lite be positioned far enough away from the press to allow

an operator to stand between the press and the primary sensing field. This safety distance between the press and the upper Link Lite was a function of the stopping or braking speed of the press, not the size of the press or the size of the Link Lite. Both Link's instructions and Tool Producers' actions acknowledged and responded to the need for this safety distance with some supplemental guard, such as a physical obstruction, or, in the alternative, a supplemental Link Lite, that being the lower Link Lite in this case.

The court in *Cox, supra,* 41 Ohio App.3d at 30–31, 534 N.E.2d at 859, held that "summary judgment for the manufacturer is \* \* \* appropriate where the product is used in a capacity which is unforeseeable by the manufacturer and completely incompatible with the product's design." The rewiring of the Link Lite in this case guaranteed that the Link Lite would not function for its intended purpose. Rewiring of the Link Lite in effect eliminated the lower Link Lite from the press. In such a case as this, the elimination of a safety device requires an entry of summary judgment in favor of the manufacturer of the safety device. See, *e.g., Burrows v. Fastener Engineers, Inc.* (1992), 78 Ohio App.3d 388, 604 N.E.2d 838 (summary judgment was appropriate where the safety device had been eliminated); *Kromer v. Beazer East, Inc.* (W.D.N.Y.1993), 826 F.Supp. 78, 80 (disabling of a safety device, which defeated the functional utility of the safety device, made summary judgment appropriate).

Nor could plaintiff succeed with a claim that the Link Lite was defective because Tool Producers was able to rewire it. Although plaintiff claims in the conclusion of his brief that the Link Lite could "easily be jumpered out," he offers no record support for this theory. Indeed, the Link Lite could not be "jumpered out" easily because it was locked and not easily accessible.

In *Kobza v. Gen. Motors Corp.* (1989), 63 Ohio App.3d 742, 580 N.E.2d 47, the court rejected the plaintiff's argument that a car was defectively designed because the car was rendered unsafe when parts of the car were removed by someone other than the manufacturer. *Id.* at 745, 580 N.E.2d at 49. The court explained that "[a]ny automobile part can be removed." *Id.* Hence, the fact that Link's product could be rendered inoperable by Tool Producers does not establish that the product itself was defective.

In *Kromer v. Beazer East, Inc.* (W.D.N.Y.1993), 826 F.Supp. 78, 80, the court ruled that disabling the safety device constituted a substantial alteration of the machine, which was the proximate cause of the employee's injuries. The court granted summary judgment because of the plaintiff's employer's disabling of a safety feature by tying it up with a rag or string. *Id.* at 79. The Link Lite was not so easily disabled. If someone is determined to open a locked box and rewire electrical components to deliberately render a safety device inoperable, the

manufacturer of that safety device should not be held liable for injuries that occur because the device was rendered useless.

In summary, the uncontroverted facts show the Link Lites were not defective; Link provided adequate instructions for installation; the Link Lites were properly designed and installed; there is no legal duty requiring Link to install or ensure that its product was properly installed after the fact; and, in any event, the proximate cause of the accident was Tool Producers' disconnection of the safety device. The trial court did not err by granting summary judgment.

Plaintiff's sole assignment of error is overruled.

*Judgment affirmed.*

DYKE and NAHRA, JJ., concur.