[Cite as *In re Brothers Publishing Co, L.L.C.*, 2014-Ohio-133.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

IN RE: BROTHERS PUBLISHING CO., LLC, dba THE EARLY BIRD

Appellate Case No.    2013-CA-6

Trial Court Case No.   2012-CV-645

(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of January, 2014.

. . . . . . . . . . .

NICOLE L. POHLMAN, Atty. Reg. No. 0086301, Goubeaux & Brand, 100 Washington Ave., P.O. Box 158, Greenville, Ohio 45331
        Attorney for Petitioner-Appellee

GARY J. LEPPLA, Atty. Reg. No. 0017172, PHILIP J. LEPPLA, Atty. Reg. No. 0089075, Leppla Associates, Ltd., 2100 S. Patterson Blvd., Dayton, Ohio 45409-0612
        Attorneys for Appellant

LOUIS A. COLOMBO, Atty. Reg. No. 0025711, Baker & Hostetler, LLP, PNC Center, 1900 E. 9th St., Suite 3200, Cleveland, Ohio 44114-3482
        Attorney *Amicus Curiae*-Ohio Newspaper Association

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Appellant, Civitas Media, LLC, dba *The Daily Advocate*, appeals from a declaratory judgment rendered in favor of Appellee, Brothers Publishing Company, LLC, dba *The Early Bird*.[1]  In support of its appeal, Civitas contends that the trial court erred by reaching its decision in the absence of adequate evidentiary materials.  Civitas also contends that the trial court erred in refusing to consider the history surrounding the adoption of R.C. 7.12.

**{¶ 2}** In addition, Civitas contends that *The Early Bird* is not a newspaper of general circulation because there is no evidence that it had either a distribution list or the ability to add subscribers to the list.  Civitas further contends that the trial court erred by concluding, in the absence of an adequate independent audit, that *The Early Bird* is a newspaper of general circulation.  Finally, Civitas maintains that the trial court's procedure was inconsistent with the Declaratory Judgment Act and the Ohio Rules of Civil Procedure.

**{¶ 3}** We conclude that the trial court failed to follow proper procedures under the Declaratory Judgment Act and the Ohio Rules of Civil Procedure.  Furthermore, the record is inadequate to demonstrate whether *The Early Bird* complied with statutory requirements under R.C. 7.12(A)(4) and (5).  In addition, R.C. 7.12(A)(4) is ambiguous, and the trial court should have considered materials that Civitas submitted regarding the legislative intent of amendments to the statute.  Finally, in view of the preceding holdings, the trial court also erred in concluding that *The Early Bird* is a newspaper of general circulation.  Accordingly, the judgment of the trial court will be reversed, and this matter will be remanded for further proceedings.

---

[1] For purposes of convenience, we will refer to the parties as Civitas and *The Early Bird*.  We also note that The Ohio Newspaper Association ("ONA") has filed a brief in support of Civitas.

## I. Facts and Course of Proceedings

{¶ 4} This case arose from what could be characterized as a "turf war" over the right to publish legal notices. *The Early Bird* is a weekly publication that wants to enter a market already occupied by Civitas. In October 2012, *The Early Bird* filed a petition for declaratory judgment in the trial court, seeking a declaration that it is a newspaper of general publication for purposes of R.C. 7.12, which requires legal notices to be published in newspapers of general circulation. Several days later, the trial court filed a document entitled "Procedural History," indicating that the Darke County Prosecutor had issued an opinion concluding that *The Early Bird* was a newspaper of general circulation. The court also indicated that it had received a "protestation letter" dated September 17, 2012. Neither the prosecutor's opinion nor the protestation letter was made part of the record.

{¶ 5} In the "procedural history," the trial court also said that it had conducted a mediation meeting on September 24, 2012, where the attendees agreed that a declaratory judgment action would be necessary in order to settle the issue. The attendees included the publisher and an attorney for Civitas, the publisher and two attorneys for *The Early Bird*, the Prosecuting Attorney and an assistant prosecuting attorney for Darke County, Ohio, the Darke County Sheriff, and the Darke County Clerk of Courts. It is unclear whether a record was made at the mediation "meeting"; at a minimum, no report of the mediator appears in the trial court record.

{¶ 6} The trial court established the following briefing schedule: any interested parties could file statements of fact and briefs by November 2, 2012; *The Early Bird* would file a reply by November 16, 2012; and any party could file final pleadings before November 26, 2012. The

trial court also stated that "[t]hereafter, unless additional time for responses or replies is granted, the matter will be submitted for decision on the merits, *unless the Court determines* that an evidentiary hearing is needed." (Emphasis added.) Procedural History, Doc. #2, p. 2.

{¶ 7} Pursuant to the court's order, Civitas filed a brief on November 1, 2012. Civitas included affidavits discussing the legislative intent of the bill. These affidavits were from Frank Deaner, a former Executive Director of ONA, and Kathleen Chandler, a former Ohio House Representative from the 68th District. Chandler was the author of the original proposed amendments to R.C. 7.12. Civitas also submitted a Report of the Local Government Public Task Force, dated May 31, 2008.

{¶ 8} In general, Civitas contended that the amendments were intended to limit qualifying publications to those that had been invited to deliver the publication, rather than mass-delivered publications like *The Early Bird*. Civitas also argued that *The Early Bird* is not a publication that has the ability to add subscribers to its distribution list, but is instead a free "Total Market Coverage" product that recipients receive whether or not they wish to do so. Finally, Civitas contended that *The Early Bird* had not demonstrated proper registration with the U.S. Postmaster, and did not provide proof of a required independent audit.

{¶ 9} *The Early Bird* filed a reply brief on November 19, 2012, and attached the affidavit of its publisher, who identified the following exhibits: (1) requests the paper had received from persons to be added to the subscription list; (2) copies of lists of more than 50 people who allegedly had "paid" subscriptions to the paper; and (3) an audit from a company called Certified Audit of Circulations ("CAC"), which indicated that *The Early Bird* was a weekly publication with a total average distribution on Sundays of 27,377. The audit was for a

six-month period ending March 31, 2011.

**{¶ 10}** Civitas filed a responsive brief on November 26, 2012, and the trial court then filed a decision and judgment entry on December 3, 2012. The court rejected the legislative materials, and concluded that *The Early Bird's* exhibits indicated that it had a distribution list and the ability to add subscribers. In addition, the court found that the publisher's statement (the CAC materials) satisfied the requirement of an independent audit. However, because the audit had not been performed within the last 12 months immediately preceding the filing of the petition for declaratory judgment, the court held that *The Early Bird* had not satisfied R.C. 7.12. Nonetheless, the court concluded that *The Early Bird* qualified as a newspaper of general circulation within Darke County, Ohio, but only after *The Early Bird* filed a newspaper's statement auditing a time period within 12 months of the date of the prosecutor's opinion.

**{¶ 11}** Civitas appealed from the decision of the trial court. In January 2013, *The Early Bird's* attorney filed a supplement to the record, attaching a copy of an audit report for a period of time from July 1, 2011 to September 30, 2012. The copy of the audit report was not verified, nor was it accompanied by any explanatory information.

**{¶ 12}** On May 20, 2013, we dismissed the appeal for lack of a final appealable order. *See In re Brothers Publishing Co., LLC v. Civitas Media, LLC*, 2d Dist. Darke No. 2012-CA-14 (May 20, 2013). We concluded that while a declaratory judgment action is a special proceeding for purposes of R.C. 2505.02, "the trial court's order did not affect a substantial right of Civitas because the order contemplated further action." Slip. Op. at p. 5. In this regard, we stressed that:

> If *The Early Bird* failed to file the audit report, Civitas would have no need

to file an appeal. Furthermore, even if a publication report has apparently been filed, we cannot decide whether the report is sufficient – that is a matter for the trial court to decide. *After such a report is filed, Civitas could challenge the report*, and the trial court would have to decide if the filing is sufficient. Again, if the trial court decides that the audit report is insufficient, Civitas would have no need to appeal. If the trial court decides that the report is sufficient, then an appeal could be taken from that judgment, which would then be final. (Emphasis added.) *Id.*

{¶ 13}  Eight days after our decision was issued, the trial court filed another Decision and Entry. The court did not provide notice to the parties, did not conduct any further hearing, and did not give the parties an opportunity to object to the Supplement to the Record. In addition, the court's brief one-and a half page decision merely states, without supporting reasoning, that the court had considered the supplement to the record filed by *The Early Bird* on January 23, 2013, and that *The Early Bird* qualified "as a newspaper of general circulation within Darke County, Ohio." Decision and Judgment Entry, Doc. #16, p.1. Two days later, the trial court issued a nunc pro tunc Decision and Judgment Entry correcting incorrect references to two dates. Civitas appeals from the decision and judgment of the trial court.

I.  Did the Trial Court Reach Its Decision

in the Absence of Evidentiary Materials

and Did the Court Fail to Follow Proper Procedures?

{¶ 14}  The First and Fifth Assignments of Error are interrelated and will be considered

together.   Civitas's First Assignment of Error is as follows:

The Trial Court Reached Its Decision in the Declaratory Judgment Action

Filed by the Appellee in the Absence of Evidentiary Materials.

**{¶ 15}**   Civitas's Fifth Assignment of Error states that:

The Procedure Followed in the Trial Court Was Inconsistent With Proper

Application of the Declaratory Judgment Act and the Ohio Rules of Civil

Procedure and Constitutes Error.

**{¶ 16}**   Under these assignments of error, Civitas contends that the trial court erred by

reaching a conclusion that is not supported by matters of record.   Civitas also argues that the trial

court failed to follow proper procedures under the Declaratory Judgment Act and the Ohio Rules

of Civil Procedure.

**{¶ 17}**   In order to put these issues in perspective, we will briefly discuss the 2011

amendments to R.C. 7.12, which are at the heart of this matter.   In 2011, the General Assembly

amended various sections of the Revised Code that pertain to legal publication in newspapers.

The amendments included changes to R.C. 7.10 and R.C. 7.12.

**{¶ 18}**   This legislation was preceded by a report from a 22-member task force that had

been appointed in 2006 to study local government public notice requirements.   *See* Sub.H.B.

101, passed by the 126th General Assembly, effective May 17, 2006.   The task force report was

issued in May 2008, and made various recommendations about notice requirements.   *See* Civitas

Brief in Opposition to Petition for Declaratory Judgment, Doc. #7, Ex. D, pp. 4-8.

**{¶ 19}**   Prior to the 2011 amendments, R.C. 7.10 provided that "Except as provided in

section 2701.09 of the Revised Code, all legal advertisements or notices shall be printed in

newspapers published in the English language." After the 2011 amendments, R.C. 7.10 stated that:

> Except as provided in section 2701.09 of the Revised Code, all legal advertisements or notices shall be printed in newspapers only of general circulation and also shall be posted on the state public notice web site created under section 125.182 of the Revised Code, and on a newspaper's internet web site, if the newspaper has one.

{¶ 20} Before the 2011 amendments, R.C. 7.12 stated that:

> Whenever any legal publication is required by law to be made in a newspaper published in a municipal corporation, county, or other political subdivision, the newspaper shall also be a newspaper of general circulation in the municipal corporation, county, or other political subdivision, without further restriction or limitation upon a selection of the newspaper to be used. If no newspaper is published in such municipal corporation, county, or other political subdivision, such legal publication shall be made in any newspaper of general circulation therein. If there are less than two newspapers published in any municipal corporation, county, or other political subdivision in the manner defined by this section, then any legal publication required by law to be made in a newspaper published in a municipal corporation, county, or other political subdivision may be made in any newspaper regularly issued at stated intervals from a known office of publication located within the municipal corporation, county, or other political subdivision. As used in this section, a known office of

publication is a public office where the business of the newspaper is transacted during the usual business hours, and such office shall be shown by the publication itself.

In addition to all other requirements, a newspaper or newspaper of general circulation * * * shall be a publication bearing a title or name, regularly issued as frequently as once a week for a definite price or consideration paid for by not less than fifty per cent of those to whom distribution is made, having a second class mailing privilege, being not less than four pages, published continuously during the immediately preceding one-year period, and circulated generally in the political subdivision in which it is published. Such publication must be of a type to which the general public resorts for passing events of a political, religious, commercial, and social nature, current happenings, announcements, miscellaneous reading matter, advertisements, and other notices.

{¶ 21} In interpreting this version of R.C. 7.12, the Supreme Court of Ohio has said that:

There is good reason for the "general circulation" requirement. The purpose of "notice" is to provide "* * * information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved, or informing him of some fact which it is his right to know and the duty of the notifying party to communicate." *Record Pub. Co. v. Kainrad*, 49 Ohio St.3d 296, 301, 551 N.E.2d 1286 (1990), quoting Black's Law Dictionary 957 (5th Ed.1979).

**{¶ 22}**  As amended, R.C. 7.12 now provides that:

(A) Whenever a state agency or a political subdivision of the state is required by law to make any legal publication in a newspaper, the newspaper shall be a newspaper of general circulation.  As used in the Revised Code, "newspaper" or "newspaper of general circulation," * * * is a publication bearing a title or name that is regularly issued at least once a week, and that meets all of the following requirements:

(1) It is printed in the English language using standard printing methods, being not less than eight pages in the broadsheet format or sixteen pages in the tabloid format.

(2) It contains at least twenty-five per cent editorial content, which includes, but is not limited to, local news, political information, and local sports.

(3) It has been published continuously for at least three years immediately preceding legal publication by the state agency or political subdivision.

(4) The publication has the ability to add subscribers to its distribution list.

(5) The publication is circulated generally by United States mail or carrier delivery in the political subdivision responsible for legal publication or in the state, if legal publication is made by a state agency, by proof of the filing of a United States postal service "Statement of Ownership, Management, and Circulation" (PS form 3526) with the local postmaster, or by proof of an independent audit of the publication performed, within the twelve months immediately preceding legal publication.

{¶ 23}  A new section of the statute, R.C. 7.12(B), was also added, and states that:

A person who disagrees that a publication is a "newspaper of general circulation" in which legal publication may be made under this section may deliver a written request for mediation to the publisher of the publication and to the court of common pleas of the county in which is located the political subdivision in which the publication is circulated, or in the Franklin county court of common pleas if legal publication is to be made by a state agency. The court of common pleas shall appoint a mediator, and the parties shall follow the procedures of the mediation program operated by the court.

{¶ 24}  The record is not clear whether Darke County Common Pleas Court operates a mediation program and what the procedures of its program might be.  Nonetheless, the statute requires appointment of a mediator.  *See, e.g.*, *Dorrian v. Scioto Conservancy Dist.,* 27 Ohio St.2d 102, 107, 271 N.E.2d 834 (1971) (indicating that "[t]he word 'shall' is usually interpreted to make the provision in which it is contained mandatory * * *.")  (Citations omitted.)

{¶ 25}  In the case before us, the trial court indicated in its procedural history that it had conducted a " 'mediation' meeting" which proved unfruitful.  This informal process does not fulfill the requirement of a court-appointed mediator.

{¶ 26}  After mediation appeared futile, *The Early Bird* filed a complaint for declaratory judgment, and the court established a briefing schedule, as noted above.

{¶ 27}  The Declaratory Judgment Act provides that " * * * any person whose rights, status, or other legal relations are affected by a * * * statute * * * may have determined any question of construction or validity arising under the * * * statute * * * and obtain a declaration

of rights, status, or other legal relations under it." R.C. 2721.03. In addition, R.C. 2721.10 provides that "[w]hen an action or proceeding in which declaratory relief is sought under this chapter involves the determination of an issue of fact, that issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the action or proceeding is pending."

{¶ 28} Contrary to the terms of the statute, this case did not proceed in the same manner as other civil actions. Even before Civitas filed a response to the complaint for declaratory judgment, the trial court issued a "procedural history," stating how the action would be handled, i.e., by written briefs. There is no indication that the trial court held a pre-trial or requested input from the parties as to the approach to be followed.[2]

{¶ 29} More importantly, after we dismissed the case for lack of a final appealable order, the trial court issued a final decision approximately one week later, without allowing the parties any input about the procedure, and without any indication in the record that Civitas was given the opportunity to challenge the audit statement that had been submitted after the original decision was rendered. This is contrary to our decision of May 20, 2013, which clearly indicates that Civitas would have an opportunity to challenge the audit report. *In re Brothers Publishing Co., LLC,* 2d Dist. Darke No. 2012-CA-14 (May 20, 2013), at p. 5.

{¶ 30} *The Early Bird* argues on appeal that Civitas waived any error by failing to object to the procedures adopted by the trial court. It is true that Civitas did not object to the trial court's briefing schedule. However, the trial court filed its "procedural history" prior to the

---

[2] The trial court may, in fact, have consulted the parties; there is simply no indication of that fact in the record.

time that Civitas had even filed an answer. The court also stated that the matter would be submitted for decision on the merits after briefing, "unless the Court determines that an evidentiary hearing is necessary." Procedural History, Doc. #2, p. 2. This is a clear indication that the decision whether to hold an evidentiary hearing was the court's alone, and Civitas may have felt that objections were futile.

**{¶ 31}** Nonetheless, we have previously said that "[w]hile one might assume that objections would be futile, * * * a party who is aggrieved by a tribunal's procedure should make some attempt to object." *Park Place Properties, LLC v. Bd. of Revision of Miami County*, 2d Dist. Miami No. 2001-CA-35, 2002 WL 242707, *8 (Feb. 15, 2002). Accordingly, even if an objection appeared futile, Civitas should have objected to the lack of an evidentiary hearing, if Civitas felt further presentation of evidence was warranted. Therefore, we reluctantly agree with *The Early Bird* that Civitas waived error with respect to the trial court's failure to hold an evidentiary hearing.

**{¶ 32}** However, even if Civitas should have objected to the trial court's original procedural decisions, Civitas had no opportunity to challenge the audit report that was filed after the trial court's original decision. This report was filed in January 2013, after the case had been appealed. When we dismissed the appeal for lack of a final appealable order, the trial court considered the audit report without giving the parties prior notice of its intended action.

**{¶ 33}** The court's failure in this regard was erroneous and prejudiced the rights of Civitas to challenge the audit report. *See, e.g.*, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (noting that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is

notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (Citations omitted.) This is essential not just in terms of the initiation of a lawsuit, but of the remainder of the litigation as well. Accordingly, the trial court's decision must be reversed and remanded, so that Civitas can challenge the audit report.

{¶ 34} Civitas also argues that *The Early Bird* failed to establish compliance with all five statutory requirements in R.C. 7.12 (A)(1)-(5). Civitas concedes that it focused primarily on compliance with R.C. 7.12 (A)(4) and (5) in the trial court. Civitas argues, however, that the factual materials submitted to the court, and upon which the court relied, were inadequate to establish all the statutory requirements.

{¶ 35} We agree that the factual record is extremely sparse. *The Early Bird* did not even submit samples of its publication to the trial court, and it is impossible to tell, based on the existing record, whether the content of the newspaper complies with statutory requirements. The record also lacks any detailed explanation of any of the matters attached to the affidavit that *The Early Bird* filed in support of its complaint for declaratory judgment.

{¶ 36} Nonetheless, Civitas failed to raise issues regarding compliance with R.C. 7.12(A)(1), (2), and (3) in the trial court, and instead focused solely on R.C. 7.12(A)(4) and (5). As a result, Civitas has waived the lack of compliance with R.C. 7.12(A)(1), (2), and (3).

{¶ 37} After reviewing the record, we find the evidence inadequate to demonstrate whether *The Early Bird* has complied with R.C. 7.12(A)(4) and (5). As we said, the record is sparse, and the affidavit attached to *The Early Bird's* trial court brief does not provide sufficient information to allow the court to decide the issues being contested. On remand, Civitas has the

option to request an evidentiary hearing.

{¶ 38}    Accordingly, the First Assignment of Error is overruled, insofar, as it pertains to R.C. 7.12(A)(1), (2), and (3), and is sustained as to the court's decision regarding R.C. 7.12(A)(4) and (5).    The Fifth Assignment of Error is also sustained.    This matter will be reversed and remanded for further proceedings.

### III.   Did the Trial Court Err in Refusing to Consider the History of the Adoption of R.C. 7.12?

{¶ 39}    Civitas's Second Assignment of Error states that:

> The Trial Court Erred in Refusing to Consider the History of the Adoption of R.C. 7.12.

{¶ 40}    Under this assignment of error, Civitas contends that the trial court erred in refusing to consider the history surrounding the adoption of R.C. 7.12.   As was noted, Civitas submitted affidavits from Frank Deaner, the former Executive Director of ONA, and Kathleen Chandler, a former member of the Ohio House of Representatives, in an attempt to explain the intent of the changes in the legislation.   Civitas also submitted the 2008 report of a task force that had been appointed to study public notice requirements.

{¶ 41}    In its original decision, the trial court stated that it would consider the current statute, and would apply it to *The Early Bird's* facts and circumstances.   Decision and Judgment Entry, Doc. #10, p. 6. The court also said that it would apply R.C. 1.49, if statutory ambiguities existed.   *Id.*   However, the court refused to consider the Chandler and Deaner affidavits, or the report of the task force, based on its conclusions that these items did not fit within the matters

listed in R.C. 1.49. Since the trial court did not thereafter apply any criteria found in R.C. 1.49, we assume the court found R.C. 7.12 unambiguous.

{¶ 42} Prior to the 2011 amendments, R.C. 7.12 required that a newspaper: (1) be published for a year prior to the legal publication being made; (2) bear a title or name; (3) be regularly issued as frequently as once a week for a definite price paid by not less than 50% of those to whom distribution is made: (4) have a second class mailing privilege; (5) be not less than four pages; (6) be published continuously during the immediately preceding one-year period; (7) be circulated generally in the political subdivision where it is published; and (8) be the type of publication that the general public uses for passing events of political, religious, commercial, and social nature, and current happenings.

{¶ 43} In contrast, the amended statute requires that a newspaper must: (1) be published by using standard printing methods; (2) be in English, and not less than 8 pages in broad sheet format, or 16 pages in tabloid format; (3) contain at least one-fourth (or 25%) editorial comment, including local news, political information, and local sports; (4) be continuously published for at least 3 years immediately prior to the legal publication; (5) have the ability to add "subscribers" to its "distribution list"; and (6) qualify for circulation by U.S. mail or by proof of an independent audit of the publication within the 12 months immediately preceding legal publication.

{¶ 44} Thus, the amendments added requirements to the length of the prior publishing period; added more specific format and greater page requirements; added a new method of delivery, by carrier; added more specific content requirements; and through the content requirements, maintained the necessity for the publication to be of a type that the public uses for current happenings. The legislation also deleted the requirement that the publication be paid for

by at least 50% of those to whom it is distributed. Finally, the amendments added requirements for distribution lists and circulation qualifications.

{¶ 45} R.C. 7.12, as amended, does not define "subscriber" or "distribution list." Civitas contends that these terms are ambiguous. In an attempt to explain the meaning of the terms, Civitas submitted affidavits from Deaner and Chandler, who were intimately involved with writing the legislation. Both Deaner and Chandler addressed the requirement in R.C. 7.12(A)(4) that a "publication has the ability to add subscribers to its distribution list." In this context, they both stated that:

In regard to requirement (4), there was clear intent to require a qualifying publication to provide proof of distribution by maintaining a distribution list with the ability to add subscribers to such list. In other words, the law requires that "X" number of households have "invited" the publication. Indeed, there was deliberate intent regarding item (4) that mass delivered publications, without receiving an "invitation" to be delivered to such household by the current occupier or resident (i.e., having the ability to add subscribers to a distribution list), would not be considered as a newspaper of "general circulation," and therefore, not qualify as a publisher of Legal Notices.

Furthermore, if the publication cannot produce a published "Statement of Ownership, Management, and Circulation" (must be published on or nearest publication date to October 1) or an independent audit (as required by item 5) OR cannot produce a defined "distribution list" that clearly defines the publication as being invited into the home, whether free or paid, then the publication is not a

"newspaper of general circulation" as defined by O.R.C. 7.12.

When considering provisions (4) and (5), the underlying intent is for government to ascertain not only the geographic penetration of the publication, but also the likelihood that the publication is being read and not simply discarded as uninvited print media.   Doc. #7, Exhibit B, Deaner Affidavit, p. 2; and Exhibit C, Chandler Affidavit, p. 2.

**{¶ 46}**   As was noted, the trial court rejected this information as not within the statutory methods of construction under R.C. 1.49.   In addition, the court apparently concluded that the legislation was not ambiguous.

**{¶ 47}**   The parties disagree as to the meaning of the word "subscribe," which itself could be evidence of ambiguity.   Civitas and ONA argue that subscribe means " 'to contract  to receive and pay for a certain number of issues of a publication * * *. ' "   ONA Brief, pp. 2-3, quoting American Heritage Dictionary (3d. Ed. 1996).   ONA also cites cases from other jurisdictions indicating that "subscribing" is equivalent to agreeing to pay.   In contrast, *The Early Bird* argues that "subscribe" means simply to " 'give one's approval,' or 'to 'register' to receive a periodical."   *The Early Bird* Brief, p. 9.

**{¶ 48}**   We agree in part with the trial court's apparent conclusion that the statute is not ambiguous.   Although different meanings might be attributed to the word "subscribe," R.C. 7.12, as amended, does not require that subscriptions be paid.   In fact, the statute as amended eliminates the requirement that at least 50% of the newspaper's subscriptions be paid.   The only apparent requirement in the amended statute is that a newspaper must have the ability to add an individual to its distribution list, upon receiving notice that the individual wishes to receive the

paper.

**{¶ 49}** On the other hand, we agree with Civitas's argument that the meaning of "distribution list" cannot be extended, as here, to include the *ways* in which the paper is delivered, i.e., "31 paid home subscriptions, 26,845 unpaid home delivery, 14 unpaid mail delivery, 322 unpaid residential bulk distribution, 165 unpaid non-residential bulk distribution." Decision and Judgment Entry, Doc. #10, p. 7. According to Civitas, this extension ignores the plain meaning of the word "list." In addition, Civitas contends that the legislature intended to exclude free, total market coverage newspapers from the definition of qualifying newspapers, because everyone receives the product for free, whether it is wanted or not. Civitas stresses that the legislature was concerned with assuring that public notices appear in publications that individuals want to receive and are likely to read.

**{¶ 50}** The legislature did not define "distribution list." "In the absence of any statutory definition of the requisite verification, we must apply the word's usual, normal, or customary meaning." *Chari v. Vore*, 91 Ohio St.3d 323, 327, 744 N.E.2d 763 (2001), citing *State ex rel. Cuyahoga Cty. v. State Personnel Bd. of Review*, 82 Ohio St.3d 496, 499, 696 N.E.2d 1054 (1998), and R.C. 1.42. According to R.C. 1.42, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage."

**{¶ 51}** "Distribute" is commonly defined as " * * * to give out or deliver esp. to members of a group (~ newspapers) (~ leaflets) * * *." Webster's Ninth New Collegiate Dictionary 368 (1991). "List" is also commonly defined as " * * * a simple series of words or numerals (as the *names of persons* or objects) (a guest ~)." (Emphasis added.) *Id*. at 697.

**{¶ 52}** Reading the meaning of distribution list as simply encompassing a list of types

of deliveries renders the requirement of a "distribution list" – and the ability to add "subscribers"

meaningless. Because the legislature could have been more clear with respect to this

requirement, we conclude that R.C. 7.12(A)(4) is ambiguous.

{¶ 53} Where statutes are ambiguous, R.C. 1.49 provides that:

[T]he court, in determining the intention of the legislature, may consider among

other matters:

(A) The object sought to be attained;

(B) The circumstances under which the statute was enacted;

(C) The legislative history;

(D) The common law or former statutory provisions, including laws upon

the same or similar subjects;

(E) The consequences of a particular construction;

(F) The administrative construction of the statute.

{¶ 54} On remand, the trial court should consider the factors listed in R.C. 1.49. We

note that while the trial court did not apparently find the statute ambiguous, the court, in what

appears to be dicta, indicated that it would not use the affidavits and task force report, in any

event, because it did not find these materials appropriate under R.C. 1.49.

{¶ 55} In support of its contention that the materials are relevant, Civitas argues that the

list of pertinent materials in R.C. 1.49 is not intended to be exhaustive. We agree with this

assertion, since R.C. 1.49 specifically says that the court may consider the listed materials,

"among other matters."

{¶ 56} Civitas also relies on *Ballard v. Beverly Ent., Inc*., 107 Ohio App.3d 5, 667

N.E.2d 993 (6th Dist.1995). In *Ballard*, the Sixth District Court of Appeals concluded that a statute pertaining to computation of overtime hours was ambiguous. *Id.* at 11. The court then considered various aspects of the legislative history of the statute, observing that:

> Neither the statements of the bill's sponsor, nor the testimony of witnesses appearing in support of the bill, nor the comments to proposed legislation as compiled by the Legislative Service Commission, reveal any intent to prohibit the 8/80 method. In fact, these statements indicate that the purpose of the bill was to bring Ohio law into compliance with the FLSA as it pertains to compensatory time off for overtime hours worked by public employees. *Id.* at 12.

{¶ 57} Similarly, in *Sheet Metal Workers' Internatl. Assn., Local Union No. 33 v. Gene's Refrigeration, Heating & Air Conditioning, Inc.*, 122 Ohio St.3d 248, 2009-Ohio-2747, 910 N.E.2d 444, the Supreme Court of Ohio considered various matters when interpreting the Ohio's prevailing wage laws. These items included the history of prevailing wage legislation, statutes and regulations relating to the same general subject matter, and industry custom and practice, as outlined in amicus briefs. *Id.* at ¶ 30-32, 33-38, and 39. In particular, the court noted that the plaintiff's suggested construction of the prevailing wage law would be "contrary to current industry standards and practices." *Id.* at ¶ 39.

{¶ 58} Another discussion of legislative intent occurred in *State v. Roberts*, 134 Ohio St.3d 459, 2012-Ohio-5684, 983 N.E.2d 334. *Roberts* addressed the legislative intent behind the adoption of R.C. 2933.82, which requires government entities "to preserve and catalog criminal-offense-related biological evidence." *Id.* at ¶ 1. In considering whether the legislation should be applied to evidence in possession of entities at the time of the law's enactment, the

Supreme Court of Ohio began with an extensive discussion of the "Innocence Movement," which was the "historical backdrop" for enactment of the law. *Id.* at ¶ 13-20.

**{¶ 59}** Eventually, the court concluded that the statutory language clearly recognized that evidence in possession of government entities at the time of its enactment should be preserved. The court then ended its statutory construction. *Id.* at ¶ 25. However, the court stressed that its holding was "supported by the historical context during which this statute was enacted." *Id.* at ¶ 26. This comment is apt, because legislation is generally not enacted in a vacuum.

**{¶ 60}** In *State v. Schlosser*, 79 Ohio St.3d 329, 681 N.E.2d 911 (1997), the Supreme Court of Ohio also specifically considered the comments of a bill's sponsor in determining legislative intent. In this regard, the court noted that:

> Looking to Ohio's statutory history, the Ohio General Assembly unanimously passed the Ohio RICO Act in 1985. 141 Appendices and General Index to the Journals of the Senate and House of Representatives (1985) 236. There is little legislative history regarding the enactment. Senator Eugene Watts, the statute's Senate sponsor, described the Ohio RICO Act as "the toughest and most comprehensive [RICO] Act in the nation" and "state-of-the-art legislation." 57 Ohio Report No. 117, Gongwer News Serv. (June 18, 1985) 3. These comments indicate an intent to impose the greatest level of accountability, i.e., strict liability. *Schlosser* at 333.

**{¶ 61}** As was noted, Sub. H.B. 101 was effective on May 17, 2006, and created a 22-member task force to study public notice requirements for local governments, The task force

was also supposed to decide if those requirements were still needed. House Representative, Kathleen Chandler, was a member of the task force throughout its deliberations. Chandler also authored and co-sponsored the original bill on public notice (H.B. 220), which was introduced in June 2009. H.B. 220 passed the House of Representatives, but was not considered by the Senate at that time. However, H.B. 220 is nearly identical in all pertinent respects to the amendments to R.C. 7.12 that were enacted in 2011.[3] The amendments to R.C. 7.12 were adopted in 2011 as part of a large bill pertaining to operating appropriations for the fiscal years 2012 and 2013. This occurred shortly after Chandler left the legislature, due to expiration of her term limits.[4]

**{¶ 62}** Accordingly, the trial court should have considered Chandler's affidavit and the report of the task force, as they were relevant background information on the amendments to R.C. 7.12. The weight to be given to these materials is for the trial court, in the first instance, on remand.

**{¶ 63}** Deaner was not apparently a member of the task force, but his affidavit indicates that he did work closely with the Ohio House of Representatives and Senate on the bill's wording. We think Deaner's comments about the intent of the legislation are irrelevant, and the trial court did not err in disregarding Deaner's opinion on the legislation. We note that his opinion is identical to that of Chandler.

**{¶ 64}** As a final matter, we do not disagree that trial courts should be cautious about considering statements of individual lawmakers. As we noted, the trial court has discretion to

---

[3] *See* http://www.legislature.state.oh.us/BillText128/128_HB_220_PH_Y.pdf., accessed November 14, 2013.

[4] *See* http://ballotpedia.org/Kathleen_Chandler, accessed November 14, 2013.

decide what weight should be given to such statements. However, *Gemsco, Inc., v. Walling,* 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945) – relied on by the concurring opinion for the proposition that "any step in the legislative process may have ambiguous significance and 'may furnish dubious bases for inference in every direction' " – actually involves a statute that the Supreme Court of the United States found unambiguous. That is not the case here, as we have determined that R.C. 7.12(A) is ambiguous.

{¶ 65}  The complete statement of the Court in *Gemsco* is as follows:

The argument from the legislative history undertakes, in effect, to contradict the terms of Section 8(f) by negative inferences drawn from inconclusive events occurring in the course of consideration of the various and widely differing bills which finally, by compromise and adjustment between the two Houses of Congress, emerged from the conference as the Act. *The plain words and meaning of a statute* cannot be overcome by a legiselative [sic] history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction. *This is such a case*. (Emphasis added.)  *Gemsco* at 260.

{¶ 66}  Based on the preceding discussion, the Second Assignment of Error is sustained.


V.  Did the Trial Court Err in Concluding that *The Early Bird*

Was a Newspaper of General Circulation?

{¶ 67}  Civitas's Third Assignment of Error is as follows:

The Trial Court Erred in Concluding that *The Early Bird* Was a

Newspaper of General Circulation.

{¶ 68}    Under this assignment of error, Civitas contends that the trial court erred in finding that *The Early Bird* was a newspaper of general circulation.   Civitas argues that there is no evidence of an actual distribution list, and that the evidentiary materials submitted in connection with the alleged audit lack a proper foundation and undercut the other materials that *The Early Bird* filed in support of its claims.

{¶ 69}    We have already concluded that the trial court's procedure was faulty and that the evidentiary record is lacking.   Accordingly, the Third Assignment of Error has merit and is sustained.

VI.   Did the Trial Court Err in Deciding that *The Early Bird*

Was a Newspaper of General Circulation

Without Proof of An Adequate Independent Audit?

{¶ 70}    Civitas's Fourth Assignment of Error is as follows:

The Trial Court Erred in Declaring that *The Early Bird*, Without a Demonstration of USPS Approval or Proof of an Adequate Independent Audit, Was a "Newspaper of General Circulation."

{¶ 71}    Under this assignment of error, Civitas contends that the trial court erred in two ways.  First, the court made its original decision based on an audit report that failed to cover the appropriate time period, i.e., within 12 months of October 12, 2012.   Second, the court, on remand, made a decision based on an audit report that is also flawed.   We agree with the first argument, as the trial court even acknowledged in its original decision that the first audit report

was insufficient. However, we decline to address the remainder of this assignment of error, insofar as it pertains to the second audit report, since the matter is being remanded to the trial court for further proceedings. Civitas may challenge the audit report on remand, as we noted in our prior decision dismissing the appeal for lack of a final appealable order.

{¶ 72} Accordingly, the Fourth Assignment of Error is sustained in part, and is overruled in part as moot, based on the remand to the trial court.

## VII. Conclusion

{¶ 73} The First Assignment of Error is overruled in part and is sustained in part. In addition, the Second, Third, and Fifth Assignments of Error are sustained. The Fourth Assignment of Error is sustained in part and overruled, in part, as moot. As a result, the judgment of the trial court is Reversed and this matter is Remanded for further proceedings.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

FROELICH, J., concurring in judgment:

{¶ 74} I disagree that the trial court erred by not considering the affidavit of an individual who was involved with the passage of certain laws concerning the meaning of an ambiguous portion of the statute or the intent of the legislature.

{¶ 75} Otto von Bismarck supposedly said, "Laws are like sausages. It's better not to see them being made." Without for an instant questioning the good faith or impartiality of the affiant in this case, this phrase is not made less relevant by the conclusory memory of any specific individual involved in their making.

**{¶ 76}** "As a general proposition, the construction and interpretation of a statute involves a question of law, not a factual issue. *Brennaman v. R.M.I., Co.* (1994), 70 Ohio St.3d 460, 466, 639 N.E.2d 425, 430; *In Re: Richardson* (July 10, 1998), Erie App. No. E-97-140, unreported, 1998 WL 456600. As a result, expert opinion is not admissible to 'assist' the court in making its decision. *Sikorski v. Link Elec. & Safety Control Co.* (1997), 117 Ohio App.3d 822, 831, 691 N.E.2d 749, 755." *State ex rel. Simmons v. Geauga Cty. Dept. of Emergency Servs.*, 131 Ohio App.3d 482, 493, 722 N.E.2d 1063 (11th Dist.1998).

**{¶ 77}** In interpreting a statute, a court should always turn first to one cardinal canon before all others: "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Natl. Bank v. Germain*, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). When a statute is ambiguous, R.C. 1.49 permits the court to determine the intent of the legislature by considering, among other things, the object sought to be attained; the circumstances under which the statute was enacted; the legislative history; the common law or former statutory provisions; the consequences of a particular construction; and the administrative construction of the statute.

**{¶ 78}** The "legislative history" of a statute arguably encompasses a broad range of documentation, including, for example, bill synopses, staff notes or bill analyses, contemporaneous statements by the bill's sponsor, conference committee reports, the executive's "signing statement," and the versions of the bill at various stages of the legislative process. *See, e.g., Adams v. Village of Enon*, 2d Dist. Clark No. 2012-CA-42, 2012-Ohio-6178, ¶ 38 (Froelich, J., concurring in part and dissenting in part). However, trial courts should be cautious when considering the statements of any individual lawmaker as to the meaning of particular provisions

of a bill; such consideration runs the risk of giving undue weight to that particular lawmaker's views. Indeed, any step in the legislative process may have ambiguous significance and "may furnish dubious bases for inference in every direction." *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945).

{¶ 79}   In my view, legislative history does not generally include an affidavit by a lawmaker, made sometime after the bill's passage, regarding the intent of the legislature in passing the legislation.   Accordingly, I disagree that the trial court erred in failing to consider the affidavit of House Representative Kathleen Chandler in interpreting the statute.

. . . . . . . . . .

Copies mailed to:

Nicole L. Pohlman
Gary J. Leppla
Philip J. Leppla
Louis A. Colombo
Hon. Jonathan P. Hein